**Brenda Joyce ADAMS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 62710.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 27, 1985.

E. Brice Cunningham, Dallas, for appellant.

Henry Wade, Dist. Atty., Stanley Keeton, Gerald Banks and Gerry Holden Meier, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

A jury convicted appellant of murder and assessed her punishment at confinement for life.

Appellant raises eight grounds of error, including a challenge to the sufficiency of the evidence. We turn first to the sufficiency issue.

Appellant contends that the evidence is insufficient to support her conviction because the testimony of her accomplice and co-defendant, Valerie Campbell, is not corroborated.

Valerie Campbell testified that she was seventeen years of age and had known appellant for about seven years. During the early morning hours of Saturday, July 15, 1978, appellant and Campbell sat in a

Denny's restaurant in Dallas and discussed Campbell's possibilities for renting a house. Appellant told Campbell that she would take her to see Martha Lou Boggs, a "real estate lady", to whom Campbell could talk about renting a house. Appellant told Campbell that she had lived with Boggs when she (appellant) was pregnant with her first child. Appellant and Campbell left Denny's, drove around for a little while, and stopped at a Tom Thumb grocery store where appellant bought some Drano and syringes. Appellant did not say anything to Campbell about her purchase.

Campbell and appellant drove to Bogg's house about 9:00 a.m., knocked on the door, and yelled through the window. Getting no answer, they went around to the back where a woman, later identified as Mrs. H.L. Burris, told them Mrs. Boggs was not at home. Appellant spoke to Burris and then called to Campbell, who was sitting in the car, to come inside Burris's house. After waiting inside the house for awhile, appellant wrote a note and asked Burris to give it to Boggs.

Appellant and Campbell left the house just as Boggs drove up in a pickup truck, accompanied by two men. The men dropped her off and left. Appellant introduced Campbell to Boggs and they all went inside Boggs's house. Boggs discussed the rental of a house with Campbell and talked with appellant. Boggs drove them, in their car, a blue and white Cadillac, to look at a house. A short time later they returned to Boggs's house.

Campbell was feeling ill and told appellant that she was ready to go. Boggs agreed that they should go. Appellant then said to Boggs, "Bitch, I remember what you did to me when I was pregnant, when I was staying with you." Boggs was sitting at her desk as appellant walked behind her, closed the curtains, and stabbed her in the neck with some syringes in which she had put Drano. Boggs stood up and wrestled with appellant. Appellant told Campbell to put something over Boggs's mouth to stop her screams. Campbell put a towel over Boggs's mouth.

Appellant grabbed a crowbar that was near the fireplace and hit Boggs in the head with it, knocking her to the floor. Appellant hit Boggs several more times until Boggs stopped screaming and lay on the floor moaning.

Campbell was holding Boggs's hands at this time to prevent her from using them. Appellant cut a cord off a lamp and tied Boggs's feet, while Campbell used a telephone cord to tie her hands. Appellant also put a stocking or sock into Boggs's mouth and tied another one around her head and mouth. They dragged Boggs into the bathroom and hog-tied her. Boggs spit one of the gags out of her mouth and told appellant she loved her and not to kill her. Appellant said "Bitch, you are going to die," and kept telling Boggs to hush. Finally, appellant grabbed a steak knife from the kitchen and stabbed Boggs several times on the left side of the body and around her heart. She also cut Boggs's wrist. Appellant told Campbell to stab Boggs and Campbell told her she could not do it. Campbell said that she did stab Boggs in the right shoulder. Campbell testified that after appellant had stabbed her appellant said, "Bitch, this is for leaving me in this house when you went out of town and leaving me home and I was pregnant."

Campbell testified that appellant refilled two syringes with Drano while they were in the bathroom and told Campbell to inject Boggs, which Campbell did. Appellant then went through the house, ransacking it. Campbell said that appellant pulled open the file cabinet looking for some check books.

They wrapped Boggs's body in a sheet, dragged it into the garage, and put it in the trunk of Boggs's car. Campbell testified that appellant slammed the lid of the trunk closed, went back inside, and ransacked the house again. Appellant then took off her blue pants suit, rolled it up in something, and threw it into the closet. She put on a black pants suit belonging to Boggs, and also put on another wig. Campbell testified that appellant then drove her to the

hospital because she was feeling very ill. Campbell testified that she was admitted to the hospital and that appellant visited her the next day and told her she was going back to the house to take things from Boggs's house.

The court found and the jury was so instructed, that Campbell was an accomplice witness as a matter of law. Appellant contends that the conviction rests solely on the accomplice testimony and is insufficient to sustain her conviction. We now examine the evidence other than the accomplice testimony to determine if the other evidence tends to link appellant with the commission of the offense. *Brown v. State*, 672 S.W.2d 487 (Tex.Cr.App.1984).

Mrs. H.L. Burris, a neighbor of the deceased, testified that shortly after 9:00 a.m. on July 15, 1978, appellant knocked on her patio door. Appellant was wearing a blue pants suit and had a wig on her head. Appellant asked Burris if she had seen Boggs. Burris told appellant that she had not seen her. Appellant asked Burris if she could come inside because it was hot outside. Burris agreed and appellant yelled across the alley to her co-defendant to back her car, a blue and white Cadillac, into the driveway and come into the house.

Appellant told Burris that Boggs was a good friend of hers, that she was worried about her and had called to see her. Appellant also said they wanted to see if Boggs could help her find a house. After waiting inside the house for twenty-five minutes, appellant wrote a note and asked Burris to give it to Boggs. Appellant and Campbell then left.

About five or ten minutes after the two left Burris's house, Burris saw Boggs, appellant, Campbell, and a third person standing by a truck outside Boggs's garage. The truck drove off and Burris walked over to Boggs's house to give her the note that appellant had left. Burris walked through the open garage door and into the house. Boggs, appellant and Campbell were inside. Appellant took the note from Burris and Burris left. A little later Burris saw the three get into the blue and white Cadillac and drive off, with Boggs driving. They returned fifteen or twenty minutes later and went back inside the house.

Harold Scott, a police officer for the city of Dallas, testified that on July 17, 1978, he investigated a call concerning an open front door at the deceased's house. When he walked up to the door he smelled an odor which was similar to that emitted from something that was dead. After getting no response to his knock he walked into the house. The house appeared to have been ransacked and Scott saw a blood stained sheet rolled up in a closet in one of the bedrooms. He also observed blood stains in the bathroom. Scott went into the garage, noticing that the source of the odor seemed to be the trunk of a green and white Cadillac. Scott called the Physical Evidence Section of the police department to the house and the trunk was opened, revealing the body of the deceased wrapped in a sheet.

Investigators from the police department found two bloodied steak knives on a table in one room, blood on the bottom sheet of a bed, and a blood stained sheet inside the closet. Contained in the sheet found in the closet, was a blue pants suit with blood stains on it, a bloodied telephone receiver, a short, black afro type wig, and a blood stained white ladies blouse. Blood stains were found all over the bathroom. The base of the telephone to which the blood stained receiver matched was found disconnected from the wall, on the floor of the bedroom. A syringe with clear liquid in it was lying on the floor beside the telephone.

Appellant's fingerprint was found on a file cabinet in the house. Investigator Glenn Thompson testified that he tested doorframes, doorknobs, papers—all items whose surfaces were conducive to latent prints, including the trunk of the Cadillac in which the deceased was found, and that none of the items checked, except the file cabinet, contained the latent prints of appellant.

Dr. Linda Norton, a forensic pathologist for the Dallas County Medical Examiner, testified that she performed an autopsy on

the deceased. She testified that the body was wrapped in a sheet that was tied in the front. The body was well into decomposition on July 18, the day the autopsy was performed. The body was hog-tied, meaning that the hands and feet were bound separately and then were bound to each other. The body was also gagged and many articles of clothing were tied and wrapped around the mouth and neck. Norton said that various items were used to bind the victim's hands and feet, including pieces of electric cord that had been pulled out of lamps.

Norton stated that at least fifteen blows had been struck on the victim's head and face. She said that these blows could have been struck with a crow-bar. There were five stab wounds, four in the area of the left chest and left upper abdomen, and one isolated stab wound to the right shoulder. There was also a wound to the left wrist. Norton testified that the stab wounds could have been caused by State's Exhibit No. 69, the steak knife mentioned previously. Several of the victim's ribs were fractured and there was hemorrhaging in the muscles of the neck. Norton said that the hemorraging could have been caused either by manual choking or by some of the ligatures that were wrapped tightly around the victim's mouth and neck. The body was too badly decomposed to determine if there were any puncture marks from a syringe.

Norton stated that neither the blows to the head nor the stab wounds, alone, would have caused death. All of those injuries and the massive amount of bleeding caused by them, combined with the gagging and binding which restricted respiration, caused death. Norton could not tell if the victim was dead when she was placed inside the trunk of the car. She said that if the victim was not dead at that time, the heat and injuries would have killed her.

Dr. Norton testified that she attempted to test for Drano in the blood of the deceased and found a higher incidence of alkalinity around the wrist wound. Norton said that this could indicate the presence of Drano in the blood, but that she would not consider it presumptive evidence and would not, therefore, interpret the alkalinity to be caused by Drano.

Sarah Williams, a forensic serologist at the Southwestern Institute of Forensic Sciences in Dallas, testified, inter alia, that a syringe was tested and that the trace of insoluble residue in the syringe could not be identified, but that it did not have the characteristics of Drano or other caustic materials.

Appellant's statement was offered in part by the State and in part by appellant. In her statement appellant said that she and Campbell drove Bruce Long's blue and white cadillac over to Boggs's house on Saturday, July 15, 1978. Appellant said that she had lived with Boggs and that Boggs was a real estate lady who could help Campbell find a house.

Appellant's confession was consistent with the testimony given by Burris and Campbell up to the part about coming back to Boggs's house after looking at a house. Appellant stated that she and Campbell drove back to Bruce Long's apartment after looking at the house, and told Long about it. Long, Campbell, appellant, and two other men, whom she knew as Slim and Shorty, drove back to Boggs's house. Slim stated that Boggs had money and started pushing her around. Appellant said that Boggs started yelling and Slim pushed her into the bathroom. She saw him stab Boggs in the chest with a steak knife while Long hit her with something. Appellant said that she told them to leave Boggs alone and Slim hit her in the eye and told her to get into the front room. She said that she got blood on her pants suit at that time. The men then wrapped Boggs in a sheet, carried it out to the garage and put it in the trunk of Boggs's car. Appellant said that the men ransacked the house and then all of them left. Long paid money to a man whom appellant did not know, and they went back to Boggs's house in his pickup truck. They loaded a king size bed, a color television, and a stereo into the truck and took them to Long's apartment.

Police found several items, including a bed and stereo, that belonged to Boggs, in Bruce Long's apartment.

Charles Hallam, an investigator with the Dallas police department, said that after the police investigated the case they did not believe appellant's version of the murder as far as it concerned the three men. They believed the murder was committed by appellant and Campbell. He said that police talked to Roy Lee Washington, the man who helped load the furniture. Hallam said that only appellant and Washington were present when the furniture was taken, and that only Campbell and appellant were present when Boggs was murdered.

Appellant testified that she did not hit or stab Boggs and that Slim, Shorty and Long murdered Boggs. Appellant claimed that on July 19, she had called the police to tell them what had happened to Boggs and that two uniformed officers arrived and she told them about the murder. While those officers were there two investigators also arrived with a warrant for appellant's arrest for the murder. Appellant also claimed that Slim, Shorty, and Long had taken her to Lake Ray Hubbard and beaten her and then tied her up and left her in a bathtub in a vacant apartment until Wednesday, July 19. Appellant had a black eye when she was arrested.

Officer W.M. Slaughter testified that on July 19, at about 9:00 p.m., he went to a certain address in response to an assault or rape call. Appellant told him she had been beaten, raped, bound and gagged for two to three days. Slaughter said that appellant did not say anything about a murder. Two investigators arrived shortly thereafter with an arrest warrant for appellant.

Sergeant William Parker testified that he arrested appellant on the evening of July 19. He said that she told him that she had been kidnapped, taken out to Lake Ray Hubbard, and raped by two individuals. Parker said that appellant told him that she had been released that afternoon, July 19, by her assailants. Appellant did not tell Parker anything about a murder.

Officer Fred MacDonald and Officer Ricardo Silva testified that at about 6:15 a.m. on Monday, July 17, they responded to a disturbance call at a home. Appellant was arguing quite vehemently with her boyfriend and his mother because they would not give appellant's child to her. Appellant was dressed in a white nurse's uniform and told the officers that she had just come from work and wanted to pick up her child. Appellant also said that her boyfriend had hit her in the face. MacDonald said that appellant's cheek bone was sort of puffy. He also said that the boyfriend attempted to hit appellant while the police were there. MacDonald said that appellant did not say anything about a murder or about having been abducted, raped or tied up in a bathtub in an abandoned apartment.

Juanita Bollinger testified that she had hired appellant to work as a nurse's aide. Bollinger said that she spoke with appellant by telephone on July 17 and fired her at that time for absenteeism. Bollinger also said that appellant came to see her either the next day, July 18, or July 19. Bollinger did not notice any physical injuries on appellant at that time.

The court found and the jury was so instructed, that Campbell was an accomplice witness as a matter of law. Appellant contends that the conviction rests solely on the accomplice testimony and is insufficient to sustain her conviction. Appellant erroneously contends that sufficiency should be reviewed by examining evidence independent of the accomplice testimony to determine whether or not this evidence is sufficient *beyond a reasonable doubt* to convict appellant.

Art. 38.14, V.A.C.C.P. provides that:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence *tending to connect* the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. (Emphasis added)

█ The test to determine the sufficiency of the corroboration is to eliminate from consideration the evidence of the ac-

complice witness and then examine the testimony of other witnesses to ascertain if there is inculpatory evidence which *tends to link* the accused with the commission of the offense. *Brown v. State,* 672 S.W.2d 487 (Tex.Cr.App.1984); *Mitchell v. State,* 650 S.W.2d 801 (Tex.Cr.App.1983). The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt.[1] *Shannon v. State,* 567 S.W.2d 510 (Tex.Cr.App.1978).

The testimony of Mrs. Burris was consistent with Campbell's and places appellant at the scene of the murder with the accomplice and in the presence of the victim. Burris did not see any other people, besides Campbell, with appellant. Appellant's own testimony places her at the scene of the murder when it occurred. Appellant was the only one who knew the victim. Evidence established that the blue pants suit appellant was wearing on the day she visited Mrs. Boggs was found covered with blood and rolled up in a bloody sheet.

■ Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Brown,* supra; *Passmore v. State,* 617 S.W.2d 682 (Tex.Cr.App.1981). Appellant's blood-stained pants suit was found at the scene; her fingerprint was found on the file cabinet; appellant was in the company of the accomplice at or about the time of the murder, *Rodriquez v. State,* 508 S.W.2d 80 (Tex.Cr.App.1974). There is no shortage of evidence tending to connect appellant with the murder. Compare *Brown,* supra, *Passmore,* supra, *Shannon,* supra, and *Rodriquez,* supra. The ground of error is overruled.

■ In two grounds of error appellant complains of the admission into evidence of various photographs. The first group of thirteen photographs to which appellant objects shows the scene of the murder, including various blood stained articles like the steak knives and appellant's pants suit, blood spots in various rooms in the house, and the open trunk of the car containing the victim's body wrapped in a sheet. These photographs are not particularly gruesome and depict the scene as the police found it two days after the murder. Testimony concerning the scene of the murder in the instant case is admissible. Therefore, photographs depicting the same are also admissible. *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr.App.1983); *Luck v. State,* 588 S.W.2d 371 (Tex.Cr.App.1979); *Martin v. State,* 475 S.W.2d 265 (Tex.Cr. App.1972).

■ The second set of photographs of which appellant complains show the decomposed body of the victim, including the wounds, lacerations and discolorations resulting from the brutal murder. The photographs depict the body as it appeared when discovered by police. A verbal description of the same is admissible, thus making admission of the photographs proper. See *Luck,* supra, *Burks v. State,* 583 S.W.2d 389 (Tex.Cr.App.1979), and *Denney v. State,* 558 S.W.2d 467, 471 (Tex.Cr.App. 1977). The grounds of error are overruled.

■ Appellant alleges that the trial court erred in admitting her oral statement concerning the whereabouts of her co-defendant when appellant was arrested. The record shows that the trial court conducted a *Jackson v. Denno* [2] hearing in regard to the admissibility of appellant's confession. The court ruled that the oral statement was admissible under Art. 38.22, Sec. 1(e).[3] However, during the trial before the jury the State never elicited either the statement itself or the existence of the state-

---

1. Appellant seems to argue that her version of the murder must be refuted beyond a reasonable doubt in order to corroborate the accomplice testimony. That is not the standard for corroboration. The independent evidence links appellant with the murder.

2. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

3. Under current law that section is Art. 38.22, Sec. 3(c), V.A.C.C.P.

ment. The record reveals that appellant's attorney elicited the statement during questioning of one of the police officers. Appellant introduced the evidence of which she now complains. No error is presented. See *Withers v. State*, 642 S.W.2d 486 (Tex. Cr.App.1982); *Womble v. State*, 618 S.W.2d 59 (Tex.Cr.App.1981).

Appellant's next objection concerns the admission of her written statement. Essentially appellant's contention is that the trial court erred in permitting the State to withdraw portions of the statement after having admitted the entire statement.

The record reflects that the State introduced the statement through Officer Hallam. Hallam read the beginning of the statement wherein appellant identified herself and knowingly and intelligently waived her rights under Art. 38.22, V.A.C.C.P. Hallam then testified that after he recorded appellant's statement and investigated the case, he determined that some of the things contained in the statement were not true. After this testimony, the prosecutor asked the court for some time to excise these portions determined to be untrue, "because of the court's prior ruling . . ." Defense counsel objected because the entire statement had already been offered and received into evidence. Defense counsel argued that the State was therefore bound to disprove any exculpatory statements. *Palafox v. State*, 608 S.W.2d 177 (Tex.Cr.App.1980). The court permitted the State to withdraw portions of the statement because the witness had not testified to those portions and the jury had not heard them.

■ The State is allowed to introduce part of a statement or confession and a defendant may then introduce the rest of the statement. *Harrington v. State*, 547 S.W.2d 616 (Tex.Cr.App.1977); Art. 38.24, V.A.C.C.P. In the instant case the prosecutor intended to do that, and believed, mistakenly, that the court had admitted the statement in part. The jury had not seen or heard any of the withdrawn portions. Appellant subsequently introduced the excised portions of the statements.

■ The trial court acted within its discretion in withdrawing something from evidence which had never gotten before the jury. We see no error in its action. The ground of error is overruled.

Appellant contends that the trial court erred in failing to grant her motion for mistrial after the State questioned a defense witness about two misdemeanor theft cases for which the witness had received probated sentences for which the probationary period had expired.

During the guilt/innocence stage of trial, Paula Barlett, a defense witness, testified that she was currently confined in the Dallas County jail and had been confined in jail at the time appellant and Campbell were also confined there. Barlett admitted that she had been in jail for awhile and that she had been previously convicted of theft by passing a worthless check. The prosecutor then questioned Barlett about another misdemeanor theft conviction. Barlett told him that she was given probation on that one and another one, and that the probationary period had expired about two weeks previously, on November 3.

During the ensuing discussion out of the presence of the jury, the prosecutor told the court that he had just checked the computer records and they showed that Barlett received thirty days in jail on one of the cases and that the other was probated. The court recessed, checked the computer record, and determined that the prosecutor was mistaken. Barlett had received thirty days probated for six months on both misdemeanor cases.

The court instructed the jury to totally disregard the testimony about the misdemeanors in which Barlett had received probation. Appellant's motion for mistrial was overruled.

■ A witness may be impeached by showing that she has been finally convicted of a felony or a misdemeanor involving moral turpitude, or has been given a suspended sentence which has not been set aside, or has been given probation which

has not expired. Art. 38.29, V.A.C.C.P. *Kirvin v. State,* 575 S.W.2d 301 (Tex.Cr. App.1978). In the instant case Barlett's probationary term had expired. The prosecutor erred in impeaching her with that conviction. However, given the trial court's instruction to the jury to disregard the testimony, and given Barlett's testimony that she had been finally convicted in one case, had been in jail for awhile, and was currently in jail, we do not believe the error was harmful. See *Hamel v. State,* 582 S.W.2d 424 (Tex.Cr.App.1979); *Waller v. State,* 581 S.W.2d 483 (Tex.Cr.App.1979). The ground of error is overruled.

Appellant's next ground of error concerns various portions of the State's argument to the jury made at the guilt/innocence stage and at the punishment stage. Appellant contends that in each instance the State was arguing outside the record.

■ The first argument of which appellant complains concerns the prosecutor's statements that appellant was lying when she told them that she was tied up in a tub for four days, and that just as that was a lie, so were the exculpatory parts of appellant's statement to the police. He said that the State did not offer those parts because they knew they were lies. Appellant's objection was sustained and the jury was instructed to disregard the statement. Appellant did not move for a mistrial. Appellant received all the relief requested. Nothing is presented for review.

■ The court sustained appellant's objection to the State's argument that the police checked out appellant's statement about the three men and did not file cases on anybody except appellant and Campbell. Once again, nothing is presented for review because appellant received all the relief requested.

The State then argued the following:
Do you really believe for one minute that if there were any evidence that Bruce, Slim and Shorty had anything to do—had anything to do with what is involved in this case, this gruesome picture, that you saw, the pictures that we saw, Dr. Nor-

ton pointed out to you, that they wouldn't be here? They wouldn't be on trial? Do you really think that?

\*     \*     \*     \*     \*     \*

You know that that is not correct, under a reasonable deduction from the evidence, is that the Dallas Police Department has let, in this city, three of the most brutal murderers go around walking free since the 20th of July, that you are ever going to find. I just tell you, Ladies and Gentlemen, that just didn't happen, and that is not the truth and that is not the facts in this case—

The court overruled appellant's objection to the argument. Appellant contends that the argument is outside the record. The State replies that this statement was a response to appellant's earlier argument that:
If you find this woman here guilty, Ms. Adams, guilty of this charge, then homicide will close the books on this case, because they will have two people, and there are three maniacs out here walking the streets and the next time we hear from them, somebody else will be dead.

Appellant then argued that other evidence demonstrated that these other men were involved.

■ We note first, that testimony at trial brought out appellant's version that three men murdered Boggs. Testimony was also adduced that the police had investigated appellant's version and found it to be untrue. Therefore, the prosecutor's argument was proper not only as a summation of the evidence and as a reasonable deduction from the evidence, but also as a response to appellant's earlier argument. *Alejandro v. State,* 493 S.W.2d 230 (Tex. Cr.App.1973). The court properly overruled appellant's objections.

■ Appellant also contends that her objection to the following argument made by the State was erroneously overruled:
Now, let's talk about Brenda Adams and see what you know about her. You know that she is the only one of all the names we mentioned who knew Martha Lou Boggs before she was murdered on

the 15th of July, 1978. You know that she selected this victim and perhaps it started out as—

There was evidence that appellant bought syringes and Drano before visiting Boggs and that appellant stabbed Boggs with the syringes. The record also shows that appellant was the only one who knew Boggs and that she made statements suggesting her motive for killing Boggs was that Boggs had left her at home while she was pregnant. The argument that appellant selected Boggs was a reasonable deduction from this evidence. The ground of error is overruled.

Appellant also contends that certain statements made by the prosecutor during his argument to the jury at the punishment stage were outside the record.

Evidence at the punishment phase showed that appellant had five prior convictions, one for theft, and four involving weapons or assault. In his argument to the jury the prosecutor explained that he recommended twenty years confinement for Campbell and that "[i]t was a decision I made, and I felt like it had to be done, but that is certainly the lowest, and I only did that because as we talked about her earlier, she is a juvenile and was a juvenile at the time, and she admitted her guilt from the start, and she has testified and she doesn't have these five things behind her, either."

Appellant objected that there was nothing in the record to indicate what Campbell's record was. The court sustained the objection and instructed the jury to disregard the statement. Appellant's motion for mistrial was overruled.

In light of the evidence introduced concerning appellant, and in light of the fact that the argument was an explanation of the prosecutor's punishment recommendation for Campbell, rather than an argument directed at inflaming the jury against appellant, we believe the court's instruction to disregard was sufficient to cure error in the argument. *Johnson v. State,* 583 S.W.2d 399 (Tex.Cr.App.1979).

Finally, appellant contends that the court erroneously overruled her objection to the following:

You ask yourselves, what is the best for Dallas County, and that is all of us, everybody in here, as opposed to Brenda Adams—

The State replies, and we agree, that the statement was a proper plea for law enforcement. *Stone v. State,* 574 S.W.2d 85 (Tex.Cr.App.1978); *Hicks v. State,* 545 S.W.2d 805 (Tex.Cr.App.1977). The grounds of error are overruled.

Appellant contends that the trial court erred in finding that appellant used a deadly weapon, to-wit, a crowbar. The docket sheet contains the court's finding that appellant used a deadly weapon, and the sentence contains a notation at the top of the page to the same effect. However, there is no recitation in the judgment concerning the use of a deadly weapon.

An affirmative finding that a deadly weapon was used must be made by the jury when the jury is the trier of fact. *Barecky v. State,* 639 S.W.2d 943 (Tex.Cr. App.1982). The jury found appellant "guilty of murder, as charged in the indictment." Neither the indictment nor the charge to the jury mentions a deadly weapon. The court's finding as noted on the docket sheet and on the sentence, was improper since no affirmative finding of a deadly weapon was made by the jury. *Barecky,* supra.

Because there is no such recitation in the *judgment* we presume that the improper notations in the docket sheet and sentence will not affect appellant's confinement. See Art. 42.12, Sec. 15(b), V.A.C. C.P. We reform the sentence by ordering the notation regarding the deadly weapon deleted. *Joles v. State,* 563 S.W.2d 619 (Tex.Cr.App.1978).

The judgment is affirmed.