**Richard James WILKERSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69291.

Court of Criminal Appeals of Texas, En Banc.

May 14, 1986.

C. Logan Dietz, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Kathlyn Giannaula, and Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of capital murder. V.T.C.A.Penal Code, § 19.03. The death penalty was imposed after the jury answered affirmatively the special issues submitted under Art. 37.071, V.A.C.C.P. Appellant brings six grounds of error before this Court. The sufficiency of evidence to support the verdict and sentence is not contested. We will affirm.

In his first ground of error, appellant contends that the trial court erred in denying his motion to suppress a confession made a few hours after he was arrested pursuant to a warrant based upon an insufficient affidavit. The affidavit upon which the arrest warrant was based gave a description of appellant, and further stated:

"As probable cause for which your affiant says that on July 1, 1983, your affiant spoke with Henry Kersten, a person your affiant knows to be a Lieutenant with the Houston Police Department Homicide Division who told your affiant that he had gone to a place of business commonly known as Malibu Grand Prix at a location near the intersection of Highway 59 and Westpark Streets in Houston and there he met Mark Villasana. Lt. Kersten told your affiant that the said Mark Villasana told him that he had discovered the body of a person he knows to be Ron Harris at 8:15 AM on July 1, 1983. Lt. Kersten said he examined the body of Ron Harris and found him to be dead of apparent stab wounds and he told your affiant that the safe at the business appeared to have been rummaged through.

Your affiant next spoke to Jerry Randall Fonzia who told your affiant that she is the mother of James Edward Randall and the aunt of Richard James Wilkerson. She told your affiant that on June 30, 1983, she spoke to Richard James Wilkerson who told her that he planned to rob the Malibu Grand Prix where he previously worked to steal $5,000.00. Mrs. Fonzia told your affiant that she knew the said Richard James Wilkerson to have been employed at the Malibu Grand Prix described at the location above.

The said Mrs. Fonzia next told your affiant that earlier the same day [presumably, July 1, 1983], she had spoken with her niece Polly Michele Winn who told Mrs. Fonzia that James Edward Randall and Richard James Wilkerson arrived at her house at approximately 6:00 AM on July 1, 1983, and that Polly Michele Winn had seen both boys in possession of a large sum of money. Polly Michele Winn further stated that she had personally handled some of the money possessed by James Edward Randall and found some of the bills to have what appeared to be blood on them."

Appellant contends that the affidavit is insufficient because it contains "double hear-

say," and there is no indication that Mark Villasana, Jerry Fonzia or Polly Winn are credible.

In *Hennessy v. State*, 660 S.W.2d 87, 91 (Tex.Cr.App.1983), this Court stated that: "Hearsay-upon-hearsay may be utilized to show probable cause [in an affidavit] as long as the underlying circumstances indicated that there is a substantial basis for crediting the hearsay at each level." [citations omitted].

■ In the instant case, the affidavit alleges that Villasana told Kersten that the body found was that of Ron Harris. Kersten was a police officer investigating the incident and the information related by him merited belief. See *Gish v. State*, 606 S.W.2d 883 (Tex.Cr.App.1980). Also, Villasana's identification of the body, which was later found to be accurate, was founded upon personal knowledge and also was credible. We find that there was a substantial basis for crediting the information related, despite its characterization as hearsay-within-hearsay.

■ The affidavit also alleges that Winn told appellant's aunt that she had seen appellant shortly after the murder with a large sum of money, and that Winn had personally handled some of the money possessed by an accomplice which appeared to have blood on it. The information related by appellant's aunt is entitled to some credibility given her relationship to appellant. The information related by Winn suggests personal and direct knowledge on her part and is also entitled to credibility. Thus, the affidavit was sufficient to present a neutral and detached magistrate with sufficient and proper information to justify issuance of an arrest warrant. See *Armstrong v. State*, 718 S.W.2d 686 (Tex.Cr.App.1985); and *Thomas v. State*, 701 S.W.2d 653 (Tex. Cr.App.1985).

■ Appellant also contends that the affidavit is infirm because the named informants are not alleged to be credible. When the affidavit contains information given by a named informant, this Court has held that the affidavit is sufficient if the information given is sufficiently detailed so as to suggest direct knowledge on his or her part. *Avery v. State*, 545 S.W.2d 803 (Tex.Cr.App.1977) at 804 citing *Lopez v. State*, 535 S.W.2d 643 (Tex.Cr.App.1976); and *Woods v. State*, 533 S.W.2d 16 (Tex.Cr. App.1976), at 19 citing *Frazier v. State*, 480 S.W.2d 375 (Tex.Cr.App.1972).

The affidavit used in the instant case contained information from named citizen informers, including appellant's aunt. The information imparted by those persons adequately indicated that they had personal or direct knowledge of the matters they asserted. Thus, the information in the affidavit was sufficient to justify the issuance of the arrest warrant despite the lack of a statement that the informers named therein were credible. Therefore, the confession obtained pursuant to the warrant was properly admitted. Appellant's first ground of error is overruled.

■ In his second ground of error, appellant contends that the trial court erred in granting the State's challenge for cause to prospective juror Christine Tapia. Appellant contends that this testimony (attached as Appendix A) shows only that the prospective juror had a stricter standard of reasonable doubt, and therefore was not subject to exclusion on a challenge for cause.

Pursuant to Art. 35.16(b)(3), V.A.C.C.P., the State is entitled to have a prospective juror excluded for cause if the juror has a bias or prejudice against any phase of the law upon which the State is entitled to rely. If a prospective juror manifests an intention to hold the State to a stricter standard of proof than that of beyond a reasonable doubt, then that juror is subject to a challenge for cause under Art. 35.16(b)(3), supra. *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985); *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983); *Woolls v. State*, 665 S.W.2d 455 (Tex.Cr.App.1983); and *Cannon v. State*, 568 S.W.2d 344 (Tex. Cr.App.1978). When we consider the prospective juror's testimony, we must accord due deference to the trial court's determination given its position to gauge the juror's sincerity and demeanor. *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985) and

*Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

In the instant case, prospective juror Tapia made it clear that she would require the State to prove its case by a more stringent standard of proof than beyond a reasonable doubt. We find that the trial court did not err by granting the State's challenge for cause to this prospective juror. See *Franklin, Hawkins, Woolls,* and *Cannon,* supra.

In this ground of error, appellant also contends that the trial court erred in refusing to permit appellant to question the juror further. The record reflects no request on appellant's part to do so. Appellant's second ground of error is overruled.

In his third ground of error, appellant contends that the trial court erred in denying his motion to video-tape a mannequin used before the jury to simulate the deceased. Appellant argues that he was unable to preserve the manner of its use for review on appeal, and was thereby denied due process of law.

The record shows that appellant filed a written request for $3,000.00 to cover the cost of video-taping the State's use of the mannequin, which the trial court denied. At trial, the mannequin was used by the State to illustrate the testimony of the medical examiner, who testified regarding the location of the stab wounds on the deceased's body. During cross-examination of the medical examiner, appellant's attorney elicited testimony describing the mannequin's dimensions and appearance. The trial court granted appellant's request to photograph the mannequin. The record contains several photographs of the mannequin which show the markings referred to by the medical examiner during his testimony regarding the deceased's wounds.

Appellant concedes that there is little caselaw on this issue, and asserts in his brief:

"Obviously, a mannequin could be used by the State to the unfair advantage of a defendant in a criminal trial merely through the manner of its use. This is especially true in final argument where a prosecutor could waive and stab a knife at a mannequin, thus perhaps injecting acts not in the record in the minds of the jurors. Nothing would be preserved for review by the court reporter because the reporter is constrained to report only words, not acts."

Appellant does not allege that the prosecutor made any hostile moves toward the mannequin, but only that he would not have been able to preserve any such acts for review.

The rules regarding the record on review are set forth in Art. 40.09, V.A.C.C.P. Subsection (4) of that article provides, in pertinent part:

"A transcription of the [court] reporter's notes when certified to by him and included in the record shall establish the occurrence and existence of all testimony, argument, motions, pleas, objections, exceptions, court actions, refusals of the court to act *and other events thereby shown and no further proof of the occurrence or existence of same shall be necessary on appeal* ; ...." [emphasis added].

Art. 40.09 also contains provisions relating to bills of exceptions and designations of material for inclusion in the record.

Recordation of prosecutors' actions for appeal purposes has been discussed in at least two cases. In *Hicks v. State,* 525 S.W.2d 177 (Tex.Cr.App.1975), during final argument, the prosecutor stated that "there is somebody that we haven't heard from in this case. And I think you all know who it is." While making this statement, the prosecutor stood behind the defendant, raised his voice, and looked down at the defendant. After the statement was made, defense counsel objected, and said:

"He is obviously commenting—inferring by the place he stood—let the record reflect that he stood right behind the defendant, raised his voice, at that time, and objected—excuse me—not objected— said, 'We haven't heard from somebody in this court.' At that time, Mr. Casey [the prosecutor] looked down at the defendant in such that by his actions and inferences and comments made, was a

comment on not testifying by the defendant."

*Id.* at 178. On appeal, the defendant contended that the prosecutor had made an impermissible comment on the defendant's failure to testify.

This Court found that given the language of Art. 40.09(4), supra, and given that there were no objections to the record and that the trial court approved the record, we could consider the prosecutor's actions to be exactly as described by defense counsel. Considering those actions with the prosecutor's words, we held that an impermissible comment had been made, and reversed the defendant's conviction.

In *Thompson v. State*, 651 S.W.2d 785 (Tex.Cr.App.1983), during final arguments, the prosecutor stretched his right arm directly towards the defendant, and stated "there is one person we have not heard from in this trial who could tell us what happened." At the conclusion of the trial, the defendant's attorney filed a motion for new trial based in part upon the prosecutor's comments. In support of the motion, the defendant's attorney filed three sworn statements which included a description of the prosecutor's movements while the statement was being made.

This Court found that this situation was "virtually indistinguishable" from *Hicks*, supra, and held that the record adequately preserved the prosecutor's actions for appeal purposes. *Id.* at 789. When the prosecutor's statements were considered in conjunction with his movements, a clear violation of Art. 38.08, V.A.C.C.P., was found and the defendant's conviction was reversed.

From these cases, it is clear that had the prosecutor stabbed the mannequin with a knife, and had appellant wished to preserve the moment for appellate review, all the appellant would have had to do was request that the action be reflected in the record.[1] A video-tape of the events would not have been considered a prerequisite for appeal. Since the trial court did not deprive appellant of due process by hampering the appellant's ability to preserve issues for appeal, no abuse of discretion or error is shown. Appellant's third ground of error is overruled.

■ In appellant's fourth ground of review, he contends that the trial court erred in admitting color photographs depicting blood on the floor of the men's room, where three bodies were found. Appellant argues that the photograph had no probative value and merely inflamed the jury.

The record reflects that several witnesses had testified that there was blood on the floor, as represented in the photographs. Also, appellant stated in his confession that he saw a lot of blood on the floor of the men's restroom.

If a verbal description of the material portrayed in a photograph is admissible, then a photograph reflecting the verbal testimony is also admissible. *Morin v. State*, 682 S.W.2d 265 (Tex.Cr.App.1983), and cases cited therein at 269. Only where the photograph's probative value is very slight and its inflammatory aspects great will admission constitute an abuse of discretion. *Id.* See also *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985).

Also, photographs depicting the scene of the offense on the date the offense occurred are admissible as long as the testimony shows that they fairly and accurately depict the scene. *Id.* at 700, citing *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App. 1979) and *Stone v. State*, 574 S.W.2d 85 (Tex.Cr.App.1978). See also *Adams v. State*, 685 S.W.2d 661 (Tex.Cr.App.1985), and cases cited therein at 668.

The photographs admitted in the instant case were not particularly gruesome and depict the scene as it was described by the witnesses. The trial court did not err in admitting the photographs. Appellant's fourth ground of error is overruled.

■ In his fifth ground of error, appellant contends that Art. 37.071(b)(2), V.A.C. C.P., is unconstitutionally vague under the due process and equal protection clauses of

---

1. For other available methods to preserve actions for appellate review, see Judge Douglas' dissenting opinion in *Hicks*, supra, and cases cited therein at 182.

the United States and Texas Constitutions. Appellant argues that future human behavior is speculative and not capable of pre-determination beyond a reasonable doubt. Also, the term "probability" is not defined for the jury, and is a source of ambiguity and vagueness.

This Court has addressed the constitutionality of Art. 37.071, supra, and has found the statute to be acceptable. *Williams v. State*, 668 S.W.2d 692 (Tex.Cr. App.1983); *Woolls*, supra; *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980), *affirmed sub nom Barefoot v. Texas*, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981). We have also repeatedly held that the term "probability" need not be defined, and may be construed according to its common and ordinary meaning. *Johnson v. State*, 691 S.W.2d 619 (Tex.Cr.App.1984); *Wicker v. State*, 667 S.W.2d 137 (Tex.Cr. App.1984), *cert. denied*, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). Appellant's fifth ground of error is overruled.

In his sixth and last ground of error, appellant contends that he was denied effective assistance of counsel guaranteed by the due process clauses of the United States and Texas Constitutions. In support of this allegation, appellant shows that his attorneys failed to do the following: go to the scene of the crime; interview the State's witnesses; conduct an independent investigation; call witnesses in appellant's defense at trial; call witnesses at the punishment phase of trial; obtain a competency hearing prior to trial; or raise an insanity defense.

■ In determining whether a defendant has received ineffective assistance of counsel, we use the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):[2] first, the defendant must show that counsel's performance was deficient; and second, the

defendant must show that the deficient performance prejudiced the defense.[3]

■ In this State, a defendant in a criminal case is entitled to reasonably effective assistance of counsel. *Ex parte Duffy*, 607 S.W.2d 507 (Tex.Cr.App.1980). Whether a defendant has received adequate assistance is to be judged by "the totality of the representation," rather than isolated acts or omissions of trial counsel. *Ex parte Raborn*, 658 S.W.2d 602 (Tex.Cr.App.1983). We apply the test as of the time of trial, and not through hindsight. *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983).

With these rules in mind, we will examine counsel's performance in appellant's defense. The record shows that a hearing was held on appellant's motion for new trial. One of the issues raised at that hearing was whether counsel had effectively represented appellant at trial. A brief synopsis of the relevant evidence presented at the hearing is appropriate.

Ray Howard was the first witness called. He was appointed to represent appellant after appellant had given his confession to the police. Howard stated that he had examined the State's exhibits very thoroughly, on more than one occasion. He did not find it necessary to go to the scene of the crime because the State had a videotape of the scene. He felt that the evidence contained in the State's file, which was open to Howard at all times, was adequate and made a personal visit to the scene unnecessary. Howard read all of the statements made by the defendant, the State's witnesses, and all parties concerned. Again, he felt that after reading their statements, there was no reason to conduct personal interviews.

Howard visited with appellant in the jail on several occasions in order to discuss the case. In those discussions, appellant gave Howard only one potential witness to call on his behalf, but Howard decided that that

**2.** This standard was used in *Butler v. State*, 716 S.W.2d 48 (Tex.Cr.App.1986).

**3.** The Supreme Court elaborated on the second part of the test stating:
"The defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."
*Strickland*, 104 S.Ct. at 2068.

witness "would not have given any kind of testimony that would have lend [sic] credence to the guilt or innocence or mitigation on [sic] punishment in this particular case." Howard stated that he could not find any witnesses willing to testify on appellant's behalf. Howard did speak with appellant's mother, grandmother and aunt, but was never able to obtain names of any witnesses to call for the defense.

With regard to appellant's competency to stand trial, Howard stated that he never made a motion to have appellant examined by a psychiatrist. When Howard talked to appellant, appellant appeared very rational and capable of understanding the proceedings and consequences of the alleged acts.

Howard stated that he was familiar with the insanity defense, and had raised it several times in other trials. He discussed appellant's possible defenses with the other attorney, Robert Scardino, and the insanity defense was not considered since there were no witnesses that could have testified as to any relevant facts. Howard added that the only witnesses that could have testified at all would have been adverse to appellant's case. Howard did discuss appellant's mental state with appellant's mother, who stated that her son was not crazy and had good sense. Howard inquired as to whether appellant had ever been examined by a psychiatrist, but was never informed of such an examination.

Appellant's mother was called as the next witness at his motion for new trial. She stated that appellant may have seen a psychiatrist prior to being placed in a special class at school, but she was not certain. She stated that appellant never had a history of violence, she did not believe that he would be a continuing threat to society, and she would have been willing to testify at appellant's trial.

Appellant's mother also stated that she was a fact witness in the case, had been interviewed by the State's attorney, and had given a statement. She had in fact taken appellant to cash his paycheck, which had been stolen at the time of the offense.

The next witness called at the hearing was Robert Scardino, appellant's second attorney. He testified that he had practiced criminal law exclusively for twelve years, and had defended fifteen capital murder defendants prior to appointment as appellant's attorney. He stated that Tom Pitcock, an investigator, had been hired to assist in the investigation of appellant's case. Pitcock tried to interview appellant's aunt, but she declined to talk about the case.

Scardino stated that the evidence in the case had been examined. He testified that on the basis of his contacts with appellant, there was no issue regarding appellant's competency to stand trial: appellant knew what he was doing, understood the allegations against him, and cooperated with the attorneys. Moreover, there was no evidence at all raising an issue regarding appellant's sanity at the time the offense was committed. Scardino stated:

"... [I]nquiries were made prior to the trial with the defendant and members of his family about whether or not there was anything that may give rise to presenting ... [the] issue [of appellant's competency to stand trial] to the court or to the jury, and that we received no information that would indicate that he was suffering from some sort of mental disease or defect at the time of the offense."

With regard to the failure of counsel to call witnesses on appellant's behalf at the guilt/innocence or punishment phases of trial, Scardino stated:

"If there had been a witness that we could have discovered or was made known to us by anyone, we certainly would have explored the possibility of using that witness; but to this day I have not been informed of a witness that may have been beneficial to the defense."

In order to evaluate appellant's contentions, a brief statement of the facts of the case is also appropriate. The following is a recitation of the events as set forth in appellant's confession. On June 30, 1983, appellant, his cousin Junior Boy, and a friend named Pony discussed committing a robbery because they needed money. Ap-

pellant told the others that he had been working at the Malibu Grand Prix and had been fired. He and the others decided to rob the employees at the Malibu Grand Prix. They each obtained knives and then rode the bus to their destination. Appellant told the others that he would take the manager into the office and that they could take care of the other employees. They stated that they would kill the others, and that appellant was supposed to kill the manager. They waited until most of the employees left after closing time.

Next, one of the remaining employees let appellant and Junior Boy inside the establishment. Shortly thereafter, appellant let Pony inside. Appellant met the manager and told him that appellant wanted his paycheck, so they went to the office to get it. Pony and Junior Boy were left with the other employees, who were playing video games.

Inside the office, the manager was talking to appellant, and offering to help appellant get his job back. When the manager turned his back, appellant pushed him from behind. After the manager fell, appellant took out his knife and told him to open the safe. The manager opened the safe and appellant took all of the money out and put it into a black leather folder. Pony and Junior Boy knocked on the door to the office. Appellant opened the door and they told him that they were "through with theirs." [that they had killed the other employees]. Appellant shut the door, and then stabbed the manager.[4] As he was stabbing the manager, the blade of the knife broke off. When appellant thought the manager was dead, he opened the door and let the others in. All three gathered up the money.

Pony and Junior Boy told appellant that they had killed the others, but he did not believe them. He went to the men's room, and saw blood and three bodies on the floor.

The three left the office and went out to the parking lot where they tried to find a car to steal. Unable to do so, they left the scene on foot. Appellant threw away the broken knife. They went to Pony's girlfriend's house and split up the money, each receiving about $600.00.

Given the testimony offered at the hearing on appellant's motion for new trial and the description of events contained in appellant's confession, we may apply the standards previously discussed and consider appellant's claim that he received ineffective assistance of counsel.

 Initially, the attorneys' failure to visit the scene of the offense does not render their representation ineffective. Howard stated that the State had a videotape of the scene, which he viewed. Afterward, he decided that an actual visit was unnecessary. Since there is nothing in the record to show that potential defenses were precluded or that a visit to the scene would have made any difference in the defense's case, the failure of the attorneys to visit the scene does not militate against a finding of reasonable representation.

 Moreover, the record does not show that the attorneys' failure to personally interview the State's witnesses rendered their representation inadequate. The attorneys went over the State's witnesses' statements and decided that further interviews were unnecessary. There is no indication that this decision was unsupported by the circumstances or impeded appellant's defense.

 Appellant claims that the attorneys conducted no independent investigation of his case. This claim is not supported by the record, which shows that an investigator was hired, the attorneys discussed the case with appellant and his relatives, they thoroughly examined the evidence, and went over the State's files. Even if the actions of the attorneys were considered less than complete, reasonable professional judgments supported the limitations on investigation. See *Strickland,* supra.

 Appellant also argues that the representation was not effective because no witnesses were called on his behalf at either the guilt/innocence or punishment

---

**4.** The record shows that the deceased was stabbed forty-two times.

phases of trial. The testimony shows that the attorneys tried to find witnesses that could testify, but were unable to do so. Although appellant's mother stated that she would have testified for her son, since she was a fact witness [having seen appellant shortly after the offense and gone with him to cash the stolen paycheck], the State could have brought out testimony detrimental to appellant had the defense decided to call her. Absent a showing that potential defense witnesses were available, and that their testimony would benefit the defense, counsel's failure to call witnesses is of no moment. *Butler,* supra, at 55, citing *King v. State,* 649 S.W.2d 42 (Tex. Cr.App.1983).

 Appellant's claims that he was not adequately represented because his attorneys failed to request a competency hearing is not supported by the record. Scardino testified that when he discussed the case with appellant, appellant showed no signs of incompetence to stand trial. Appellant knew what he was doing, understood the charges against him and cooperated with his attorneys. Absent evidence to the contrary, the attorneys did not disserve appellant by failing to request a competency hearing prior to trial. See *Coble v. State,* 501 S.W.2d 344 (Tex.Cr.App.1973).

 Last, appellant claims that the insanity defense should have been advanced. The attorneys' discussions with appellant and his family, and their examination of the evidence in the case raised no issues regarding his sanity at the time of the offense. The facts as set forth in the confession appellant gave to the police do not show that he was insane at the time of the murders. Moreover, appellant's mother stated that her son was not crazy, and had good sense.

In *Ex parte Duffy,* supra, we found that trial counsel's failure to conduct the requisite investigation and advance the only *viable* defense available constituted ineffective assistance of counsel. In that case, there was evidence that the defendant may have been legally insane at the time the offense was committed. The case at bar, however, contains no such evidence and insanity was simply not a viable defense to advance. Thus, appellant's counsel did not err by failing to raise a non-existent defense at trial. See *Ex parte Vestal,* 468 S.W.2d 372 (Tex.Cr.App.1971), but cf. *Butler,* supra.

Considering the totality of the representation, we find that appellant's counsels' representation was not deficient and did not fall below an objective standard of reasonableness. Having so found, we need not address the second issue set forth in *Strickland,* supra, regarding possible prejudice to appellant. Appellant's sixth ground of error is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., dissents.

### APPENDIX A

"Q. [By Prosecutor] I am asking you if you need more than beyond a reasonable doubt? Would you require me, because we are talking about a capital case, would you require me to prove it to you beyond all doubt?

"A. I would like it that way. I wouldn't want a doubt at all.

"Q. Do you think that you could render a verdict based on just a burden of beyond a reasonable doubt on these two questions, or would you require me to prove the answers ought to be yes beyond all doubt?

"A. I would like it beyond all doubt for myself. And if it was just a little beyond reasonable doubt, then I would go for that, too; but I would rather have it above a doubt.

"Q. Do you see a difference between beyond a reasonable doubt and beyond all doubt?

"A. It seems like it is too close to maybe not.

"Q. What's too close to maybe not?

"A. Beyond a reasonable doubt.

"Q. Well, since you perceive a difference in them, are you telling me that in a capital case you would require me to prove it to you beyond all doubt?

"A. I wouldn't want to have any doubts myself. I would want it proven beyond, totally.

"Q. So would it be fair to say, that if you were sitting on the jury and the evidence was presented to you, that you couldn't reach a verdict beyond a reasonable doubt, you would require every doubt in your mind erased before you could answer both questions?

"A. I would like that. As a person, I would like that.

"Q. Now, having told me that you would like it and that that would be your preference, I need to go a little bit farther with you, because, remember, these questions that I am asking you are based on the anticipation that you are back in the jury room alone with your conscience.

"A. Exactly.

"Q. There is not going to be any opportunity to change your mind.

"A. Right.

"Q. So if you are selected on the jury, would you require me to prove it beyond all doubt?

"A. I would feel better, truly feel better with my conscience, knowing that there were no doubts.

"Q. I don't want to get you in trouble with your conscience.

"A. Right. I would like to live to be 80 years old and know that I didn't have any doubts at that judgment of mine.

"Q. In order for you to live with your conscience when you are 80 years old, would you, Christine Tapia, sitting on a jury, require a burden of beyond all doubt?

"A. Okay, what are you asking me?

"Q. I am asking you if you would hold me to a higher burden than a burden of beyond a reasonable doubt.

"A. I probably would, yes.

"Q. Really, once again, we are back to saying that your preference is or maybe or golly gee. That's fine, if that is what you require. I just need to know it.

"A. Oh, yes.

"Q. So would you require beyond all doubt?

"A. Yes. I would be happier that way. I don't think I could sit and judge, knowing there might be a doubt in there somewhere. I would like it, if it was going to be presented to me and if it was a decision I was going to help make with other people, I would like to be convinced and have no doubt at all. And it would be putting you probably through a lot, too, because I would be just one of all those many people that you would have to convince.

"Q. See, that is why I am trying to discuss this with you, because if there are eleven people sitting on the jury saying: State, your burden is beyond a reasonable doubt—and I can handle that, I can live with myself making a judgment based on that quantum of proof, but there is one person sitting on the jury saying: No, in good conscience, I want every doubt in my mind erased, I need to know that, because probably I can't prove it to you to erase every doubt; therefore, maybe you shouldn't be in that position of taking an oath to uphold the law when you yourself couldn't do that.

"A. Right.

"Q. Have I made myself clear at all?

"A. Yes.

"Q. So now can you tell me if you would require me to prove it to you beyond all doubt?

"A. Yes, I would.

"Q. Once again, there was some hesitation there.

"A. Since I have never been placed in something like this, it is kind of new. I don't think about things like that, right? Not every day, I don't think about things like that; and being faced with it right now, you are going to have to search and think for awhile and think is this—

"Q. That is why we want you to search and think now before you are put in the jury box and you are faced with making a decision which might be in conflict with your conscience.

"A. I would like for the State to prove beyond the reasonable doubt. Like he said, that statement is so, you know, to me that is just what it is, just a statement, and you have to prove it. I mean I wouldn't want a doubt at all.

"Q. Okay. But, once again, I have to ask you the question: If I prove it to you beyond a reasonable doubt, will you say: No, not yet, I can't reach a verdict, I can't answer these questions unless you prove it to me beyond all doubt?

"A. What is reasonable doubt?

"THE COURT: That is a good question.

"A. Somebody that thinks back; Well, maybe, or maybe not, that type of reasonable doubt?

"Q. Well, reasonable doubt, as the judge told you, there isn't any definition for. I would submit it's not beyond all doubt. It is different from beyond all doubt. It is different from beyond a shadow of a doubt. To make a decision beyond a reasonable doubt, you would probably have to use your logic and common sense to do that. But there may be people who think, that in a situation as serious as a capital murder, that the burden ought to be higher—it ought to be beyond all doubt.

"A. I would prefer that. It has to be beyond all doubt.

"Q. I understand that you would prefer it. Would you require it of me?

"A. Yes.

"Q. So if you were sitting in the jury box, you wouldn't render a verdict unless every doubt in your mind was erased, is that correct?

"A. Correct.

"Q. So even if I proved it to you beyond a reasonable doubt?

"A. Reasonable? Define reasonable.

"Q. Well, the judge has already told you that there isn't a definition for beyond a reasonable doubt. Now, you have just indicated to me that you see some difference between the burden of beyond a reasonable doubt and beyond all doubt.

"A. All doubt, there is the key word—all. There is no more doubt, ever. All. Knowing it all. Doubt in itself, you know there is a negative in there somewhere that you are not sure of.

"Q. Well, see, that is what I am unclear on. Do you see a difference between beyond a reasonable doubt and beyond all doubt?

"A. The word "all".

"Q. Do you see a difference in those concepts, a difference between proving something to you beyond a reasonable doubt and proving something to you beyond all doubt?

"A. I see the difference.

"Q. You do see a difference?

"A. Yes.

"Q. Do you feel like beyond all doubt is a higher burden than beyond a reasonable doubt?

"A. Yes.

"Q. That is just what I am trying to clarify. So even if I proved to you beyond a reasonable doubt that these questions ought to be answered yes, you wouldn't do it unless I proved it to you beyond all doubt—is that a fair assessment of what you are saying?

"A. Yes.

"MS. MILLOY: Your Honor, I would move to challenge the juror in that she would require of the State a higher burden than that imposed by the law.

"MR. SCARDINO: [Defense Counsel] May I take the juror on voir dire?

"THE COURT: Certainly.

. . . . .

"Q. Now, you kept asking for a definition. Nobody can give you one. It is whatever you want it to mean. Certainly it would be unfair, and we would never have justice, we couldn't have courts, no one would ever be brought to trial and brought to justice if the burden of proof was beyond an unreasonable doubt, would it?

"A. Correct.

"Q. So that is not the burden of proof. I submit to you, that if beyond all doubt included every little inconsistency,

every little innuendo, everything that didn't add up just right other than the defendant's guilt, would that be a fair way to proceed?

"A. No.

"Q. If jurors were allowed to return verdicts of not guilty when witnesses just disagreed on the color of someone's eyes or the color of their shoes, and that really didn't have anything to do with whether they murdered someone or not, wouldn't that be an unreasonable doubt?

"A. Yes.

"Q. So, now, if you were on a jury and the State convinced you of the issues that they had to convince you of—that the crime took place in the county that they said it did; that the person on trial took the life of his victim; that he took that life while he was in the process of taking their [sic] property; and that he intended to do it—and you were convinced beyond a reasonable doubt that those things happened, but some of the little things—the way the police officer said they arrested this person, the times might be off two or three or five or ten minutes, or the place may be a few hundred yards from where one said it happened to where the other one said it happened, the victim, one may have said he had on brown pants and the other one may have said he had on blue pants. That is some doubt as to what occurred, but it is not a reasonable doubt as to whether the accused committed the crime, is it?

"A. No.

"Q. Okay, now, tell me whether or not, in response to what the prosecutor has talked to you about, whether you would cause her to prove her case to you beyond a reasonable doubt or beyond all doubt.

"A. I would want all doubt.

"Q. Even concerning the issues that did not go to the crux of whether the defendant was guilty or not? These questions don't have anything to do with that.

"A. I would want it proven to me, for Chris, without no [sic] doubt. That would mean not the blue pants or the brown pants or anything like that. I mean I am talking about it would have to be proven to me first. I would not judge—I can't judge that way. It has to be proved without any doubt. Like I told her, I want to be 80 years old and never think back that I decided or chose on something that I did have a doubt on."

TEAGUE, Judge, dissenting.

In making the statement, "In determining whether a defendant has received ineffective assistance of counsel, *we use the standard set forth in Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)," (My emphasis), and by what else is stated in the opinion, I believe that the majority opinion has implicitly, if not expressly, mandated that in all future cases what was stated and held in *Strickland v. Washington, supra,* will control whether trial counsel was or was not effective counsel.

In making the above statement, the majority opinion has, in my view, also buried without even a one-gun salute the opinion of *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Cr. App.1980), which formerly was used to make the determination whether or not, as a matter of State law, trial counsel was effective. Based upon the above statement in the majority opinion, *Duffy* is now dispatched to Davey Jones' footlocker, in order to take its place among so many of the other decisions of this Court that have recently been overruled by an aggressive and assertive majority of this Court.

The above, however, is simply just one more example of this Court's aggressive and assertive majority's attempts to mimic decisions by the United States Supreme Court. To this Court's continuing abdication of its duty to act as an independent State judiciary, I respectfully dissent.

By this dissent, however, I do not mean to leave the impression that I agree with

everything else that is stated in the majority opinion—because I don't.