# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00531-CR

**James King, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
## NO. 001502, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant James King was charged with assault with bodily injury, enhanced by a previous conviction for assault against a family member. Following a trial to the court, King was convicted of the charged offense. He was sentenced to ten years in the Texas Department of Criminal Justice, Institutional Division, probated for ten years, and assessed a fine of $500. By three issues, he challenges his conviction, arguing that (1) the evidence was factually insufficient to support the conviction, (2) he was denied effective assistance of counsel, and (3) his conviction should not have been enhanced because the evidence was legally insufficient to support a finding of prior family violence. We will overrule his issues and affirm the conviction.

**DISCUSSION**

By his first issue, King challenges the factual sufficiency of the evidence to support his conviction. A person commits assault by intentionally, knowingly, or recklessly causing bodily injury to another. Tex. Pen. Code Ann. § 22.01(a)(1) (West 2003). In determining the factual sufficiency of the elements of an offense, the reviewing court views all of the evidence in a neutral light. *Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). The court reviews the evidence weighed by the fact finder that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact. *Id*. In conducting its factual sufficiency review, an appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). The reviewing court, however, does not substitute its judgment for that of the fact finder and should set aside the verdict only if the evidence is so weak as to be clearly wrong or manifestly unjust or if the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. *Zuliani v. State*, 97 S.W.3d 589, 593 (Tex. Crim. App. 2003); *Johnson*, 23 S.W.3d at 11; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

Jacqueline Middleton, mother of the complaining witness Kendra Middleton, testified about the morning of December 19, 1999, a Sunday. She and Kendra were at Jacqueline's apartment in Austin, preparing to go to church, when King called Jacqueline. Jacqueline told King that Kendra was not there and that she would let Kendra know that King had called for her. She said she lied to King to protect Kendra. Just before 11:00 a.m., Jacqueline and Kendra entered Kendra's car, which

2

was parked in the apartment complex parking lot, intending to go to church, when King pulled up behind the car, blocking Kendra's car and preventing her from leaving. Kendra, who was in the driver's seat, rolled up her window and locked her door. King quickly got out of his car, approached Kendra's car, punched out the driver's side window with his hand, leaned into the car, and began pulling and tugging on Kendra. Jacqueline, who was in the passenger's seat, immediately got out and tried to pull King off of Kendra, imploring King to leave Kendra alone. Once she realized that she could not budge King, Jacqueline went to a neighbor's apartment and asked her to call the police. When Jacqueline returned to Kendra's car, King had returned to his vehicle and was preparing to leave. Jacqueline observed that Kendra was upset and shaken and saw fragments of glass on her and all over the inside of the car.

Although Jacqueline had asked a neighbor to summon the police, she and Kendra decided not to wait for the police and departed in Jacqueline's car, still intending to go to church. As Jacqueline, the driver, was heading down the highway, she noticed King's vehicle following her. Afraid that she would run out of gas, Jacqueline stopped at a convenience store and suggested that Kendra wait inside the store. King followed. The store clerk allowed Kendra to hide behind the counter, which is where she remained when King entered the store. Jacqueline was also in the store; however, she was in plain view. Once inside, King called out to Kendra, and said he had her keys. Kendra refused to come out from behind the counter, and King eventually left with Kendra's keys. The police arrived afterwards, in response to a call from the store clerk, which was requested by Jacqueline and Kendra.

Kendra Middleton testified that she and King met in 1987, started dating, and had a daughter together in 1990, B.K. They married in 1995 or 1996. Between 1988 and 1990, King worked in Houston but lived with Kendra when he was in Austin. Kendra has two other daughters, one older and one younger than B.K.; neither is King's biological daughter, but he treated all three children as though they were his. Kendra and King separated in September 1999. After the separation, Kendra and the children moved out of the couple's apartment and stayed in a number of different places: her mother's house, a friend's house, and a shelter.

Kendra's testimony about what happened the morning of December 19 at her mother's apartment complex was substantially similar to Jacqueline's testimony. She added that after King punched out her car window, he pried her keys from her hand and snatched her glasses off her face. He then returned to his truck and left. Kendra suffered cuts on her hands as a result of the broken window and some bruises on her face. She testified that she had only minimal scarring—"[m]aybe one"—on her hands as a result of the cuts.

Kendra and her mother did not change their plan to go to church, and because Kendra no longer had her car keys, the two women took Jacqueline's car; Jacqueline drove. On their way to church, they noticed King following them. They decided to stop at the nearest gas station. Kendra ran into the convenience store and asked the store attendant to call the police. She then hid behind the counter. King entered the store and called for Kendra, telling her that if she wanted her keys returned, she needed to come out from wherever she was. Kendra never came out from behind the counter while King was in the store. He eventually left after a couple of minutes, taking Kendra's keys with him.

4

Shortly afterwards, the police arrived. Kendra explained to the police officer what had happened and signed a statement. A police officer also took photographs of her injuries. Kendra and her mother returned home after speaking to the police.

On cross-examination, Kendra testified that she understood King's grandmother had died shortly before the December 19 incident, and she knew that King wanted to take the three children with him to his grandmother's funeral that day. She stated, however, that the two had never reached an agreement about whether King could pick up the children and take them to the funeral.

She also revealed that she obtained a divorce from King the day before the trial on his criminal charges. Although Kendra was living in Indiana at the time of the trial, she was flown to Austin to testify at the criminal trial and thus was able to appear for her divorce hearing, as well. King's counsel suggested that Kendra benefitted in her divorce case from the criminal allegations she made against King, although she denied the suggestion.

Austin Police Officer John Sevier testified that he was on duty on December 19, 1999, when he was dispatched on a call to one location and then while en route, was told to proceed to the convenience store location instead. The call indicated that someone had a shotgun and a pistol, so several officers responded to the call. When Sevier arrived, he met with Travis County deputies who told him that they had an assault victim. Sevier's first observation of Kendra was that she was "shaken up," scared, and "mildly sobbing." She also had redness to the side of her face, "as if you were hit," and a scratch on her right hand with some dried blood on it.

Kendra reported to Sevier the events that occurred earlier at her mother's apartment complex. She also told Sevier that King had assaulted her in the past and reports were made to the

5

police.  She stated that King frequently carries a pistol or shotgun.  Sevier testified that another officer photographed Kendra's injuries.  The photos were given to Sevier, who in turn forwarded them to the family violence unit along with Kendra's statement.  He had not seen the photos since.  Sevier could not recall Kendra mentioning anything about King following her to the convenience store, nor did she mention that King had snatched the glasses off her face.

Sevier also interviewed Jacqueline.  Jacqueline's statement was very similar to her daughter's.

King testified in his defense that in December 1999, he was living in Houston and commuting to Austin; he maintained households in both cities.  Shortly before December 19, King's grandmother passed away, and he asked Kendra if he could take all three of her daughters with him to his grandmother's funeral in Michigan.  According to King, Kendra agreed.  So, on the morning of December 19, King drove to Austin from Houston to pick up the girls.  He arrived at the house he shared with Kendra in Austin and found no one there.  He called Jacqueline's apartment and was informed that she did not know where Kendra or the girls were.  King, however, saw Kendra's car in the parking lot and knew she was in her mother's apartment.  He assumed Kendra's daughters were inside with her and decided to wait for the girls to come out of Jacqueline's apartment.  He saw Kendra and her mother come out of the apartment without the three girls.  That is when he parked his truck behind Kendra's car.  He got out of his truck, walked over to the driver's side of Kendra's car, where Kendra was seated, and as he approached, Kendra kicked the car door into him.  The car door slammed shut.  King reached inside across the door and ended up grabbing Kendra's car keys.  King testified that he did not pull Kendra's hair, nor did he see any blood on her hands.  After he

6

grabbed the car keys, King retreated from the car window, and Jacqueline started hitting him. He then got in his truck and left. King testified that the window broke, but he did not put his fist through it.

After he left Jacqueline's apartment complex, King intended to go to Kendra's sister's house to look for Kendra's daughters. On his way, he saw Kendra and her mother and thought they must be trying to get to Kendra's sister's house before he got there. King followed them and ended up at the convenience store. There he offered to return Kendra's keys. Kendra refused the offer, so King left and headed for Kendra's sister's house to try to find the girls.

On cross-examination, King explained that he approached Kendra in her car to find out where the girls were. "The next thing you know, boom, the door [came] out. Glass shattered." According to King's version of events, he did not hit the door or the window with his fist, which is why there were no cuts on his hands. He explained that the window broke when Kendra kicked the door. He took the keys from Kendra because he was worried that she would harm him with her car in some way.

At the convenience store, King did not recall that Kendra was "hiding" behind the counter. Rather, he said she was standing behind the counter. He asked if she wanted her keys, and she said no.

King contends on appeal that his version of events is more consistent with the evidence adduced at trial than Kendra's version. He points to the fact that Officer Sevier did not observe any cuts on Kendra's hands; he saw only a scratch with some dried blood. In addition, King had no cuts or injuries, which, according to King, is inconsistent with Kendra's account that King

punched the window and shattered it. Because the State could not find the photos that were taken of Kendra on the day of the assault, the trial court accepted as fact that the photographs did not reflect any visible injuries.[1]

The trial court was presented with conflicting accounts of what happened on December 19. Although King claims that Kendra was not injured, Kendra, Jacqueline, and Sevier all testified that Kendra suffered some injury. The trial court as fact finder was the exclusive judge of the weight to be given the testimony and the credibility of the witnesses. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). The trial court was free to reject or accept any or all of the evidence presented by either party. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). Viewing the evidence in a neutral light, we cannot say that the evidence of injury is so weak as to be clearly wrong or manifestly unjust or that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. We overrule King's first issue.

By his second issue, King contends that his trial counsel's preparation and performance at trial fell below a reasonable standard of professional conduct resulting in harm to King's defense. The Sixth Amendment to the United States Constitution guarantees the right to reasonably effective assistance of counsel in state criminal proceedings. *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970); *see also Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim.

---

[1] During the trial, King's trial counsel argued that he had seen the photos in the State's file and that the photos reflected no injuries on Kendra. King's attorney suggested that the State was withholding the photos because they were exculpatory, in that they supported King's defensive theory that King did not cause injury to Kendra, as evidenced by Kendra's lack of injuries in the photos.

App. 1986). The standard for appellate review of the effective assistance of counsel is the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted in Texas by *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). Under the *Strickland* standard, a convicted defendant must (1) show that his trial counsel's performance was deficient in that counsel made such serious errors he was not functioning effectively as counsel, and (2) show that the deficient performance prejudiced the defendant to such a degree that the defendant was deprived of a fair trial. *Strickland*, 466 U.S. at 687; *Parmer v. State*, 38 S.W.3d 661, 665 (Tex. App.—Austin 2000, pet. ref'd). Unless a defendant makes both showings, we cannot say that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. *Strickland*, 466 U.S. at 687; *Oestrick v. State*, 939 S.W.2d 232, 237 (Tex. App.—Austin 1997, pet. ref'd). Under *Strickland*, a defendant has the burden to prove a claim of ineffective assistance of counsel by a preponderance of the evidence. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996); *Parmer*, 38 S.W.3d at 665.

The review of a claim of ineffective assistance of counsel is highly deferential. *Strickland*, 466 U.S. at 689; *Busby v. State*, 990 S.W.2d 263, 268 (Tex. Crim. App. 1999). Every effort must be made to eliminate the distorting effect of hindsight. *Strickland*, 466 U.S. at 689; *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). A reviewing court must indulge a strong presumption that trial counsel's conduct fell within the wide range of reasonable representation. *McFarland*, 928 S.W.2d at 500. An ineffectiveness claim cannot be demonstrated by isolating one portion of counsel's representation. *Parmer*, 38 S.W.3d at 666. Courts assay the totality of counsel's representation rather than isolated acts or omissions. *Wilkerson*, 726 S.W.2d

9

at 548; *Duvall v. State*, 59 S.W.3d 773, 779 (Tex. App.—Austin 2001, pet. ref'd). The *Strickland* standard has never been interpreted to mean that the accused is entitled to errorless or perfect counsel. *Bridge v. State*, 726 S.W.2d 558, 571 (Tex. Crim. App. 1986). Moreover, the fact that another attorney might have pursued a different course of action at trial will not support a finding of ineffectiveness. *Nethery v. State*, 29 S.W.3d 178, 188 (Tex. App.—Dallas 2000, pet. ref'd).

King argues that he was denied effective assistance of counsel because his trial counsel did not "attempt to investigate or secure the assistance of an expert to assist in the defense that the glass described by the witnesses was [un]able to cause injury." King suggests on appeal that an expert could have determined whether the window on Kendra's car was made of "safety glass" and whether safety glass is capable of cutting or causing injury to an individual when it breaks.

As the trial court observed, however, King failed to rebut statements that he caused Kendra injury. "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." Tex. Pen. Code Ann. § 1.07(a)(8) (West 2003). Even if an expert were to have testified that Kendra could not have been cut by the broken glass, Officer Sevier testified that he observed a scratch on Kendra's hand and redness on her face. These signs of injury could have been caused by a struggle between King and Kendra, if not by the broken glass. King himself admitted that he reached into the car and grabbed Kendra's keys. Thus, even if King's trial counsel could be considered deficient for failing to secure the assistance of an expert, King has failed to show how he was prejudiced by the deficiency.

King also lists a number of other "issues" for which his counsel expressed a lack of understanding.[2] He fails to explain, however, how the deficient performance, if any, prejudiced him to such a degree that he was deprived of a fair trial. We therefore overrule his second issue.

By his third issue, King argues the evidence was legally insufficient to support the State's enhancement of a misdemeanor assault to a third degree felony in the absence of an affirmative finding of family violence in the prior conviction. In reviewing legal sufficiency, we review the evidence in the light most favorable to the prosecution to determine if any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Lane v. State*, 933 S.W.2d 504, 507 (Tex. Crim. App. 1996).

Assault with bodily injury is ordinarily a class A misdemeanor, but can be enhanced to a third degree felony if the offense is committed against "a member of the defendant's family or household, if it is shown on the trial of the offense that the defendant has been previously convicted of an offense against a member of the defendant's family or household under this section." Tex. Pen. Code Ann. § 22.01(b)(2) (West 2003). "Family" includes individuals related by consanguinity or affinity; individuals who are former spouses of each other; individuals who are the parents of the

---

[2] For example, King's counsel announced ready for trial, knowing that King's divorce trial was set for the same date as the criminal trial; he represented King in both causes. Consequently, King's counsel requested a continuance in the criminal case on the day of trial. According to King's appellate brief, his trial counsel also reflected a lack of understanding regarding the nature of a prior assault as an element of the alleged offense. In addition, during the State's presentation of evidence, the State requested a short break so that the fingerprint technician could fingerprint King, compare the fingerprints to those from King's prior conviction, and testify about his results shortly afterwards. King's trial counsel objected to having King fingerprinted, claiming that it was self-incriminating. He also sought a motion for new trial during the State's case in chief, and he repeatedly requested that the trial court administer a polygraph examination so that he could be questioned on whether he actually saw the photographs that the State claimed to have lost.

11

same child, without regard to marriage; and a foster child and foster parent, without regard to whether they reside together. Tex. Fam. Code Ann. § 71.003 (West Supp. 2002). The code of criminal procedure provides that if a trial court determines that an offense under title 5 of the penal code involved family violence, the court "shall make an affirmative finding of that fact and enter the affirmative finding in the judgment of the case." Tex. Code Crim. Proc. Ann. art. 42.013 (West Supp. 2003); *State v. Eakins*, 71 S.W.3d 443, 445 (Tex. App.—Austin 2002, no pet.) (article 42.013 requires affirmative finding in judgment whenever trial court determines that family violence was involved in title 5 offense).

Here, the State introduced and the court admitted into evidence a judgment dated May 6, 1992, convicting King of assault with bodily injury based on King's plea of nolo contendre. The judgment did not include an affirmative finding that family violence occurred. During the trial, Kendra testified that she was the victim of that assault and that at the time, she had been living with King and the two already had a child together. King also testified in response to cross-examination that he had been convicted of assault with bodily injury on May 6, 1992, and that the victim of that assault was Kendra Middleton. He further admitted that at the time of that offense, Kendra was the mother of their daughter.

King argues on appeal that the absence of an affirmative finding of family violence by the trial court in the 1992 conviction necessarily constitutes an adjudication that family violence did not occur, and the State should be barred from relitigating the family violence issue in a subsequent proceeding. This Court, however, has held otherwise. In *Eakins*, we held that "[t]he failure of the trial court . . . to affirmatively find that family violence was involved in [the prior]

12

offense does not necessarily mean that the court considered the issue and determined that family violence was *not* involved." 71 S.W.3d at 445. We refused to construe article 42.013's requirement of an affirmative finding as the *only* method of proving a previous conviction for family violence. Furthermore, there is nothing in penal code section 22.01 or code of criminal procedure article 42.013 that precludes the use of extrinsic evidence to establish that a prior assault was committed against a family member. *Id.* In sum, the absence of an article 42.013 affirmative finding does not preclude a later determination, which may be based on extrinsic evidence, that the prior conviction was for assault of a family member. *Id.* at 444. The trial court therefore did not err in allowing the State to introduce extrinsic evidence to establish that King's prior conviction involved family violence. The evidence is thus legally sufficient to support a finding of a prior family violence conviction and to enhance King's conviction from a misdemeanor to a felony. *See Mitchell v. State*, 102 S.W.3d 772, 775 (Tex. App.—Austin 2003, pet. filed). We overrule his third issue.

## CONCLUSION

Having overruled all of King's issues, we affirm the conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: October 2, 2003

Do Not Publish

13