**In The**

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-21-00370-CR
_____

### JOSHUA HENDERSON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 18-30460**

---

### MEMORANDUM OPINION

A grand jury indicted Appellant Joshua Henderson for the murder of Floyd Dergent by use of a deadly weapon, namely a firearm. *See* Tex. Penal Code Ann. § 19.02(b)(1). In a revised indictment, the charge against Henderson also alleged that he had previously been convicted of two felonies. Henderson pleaded "not guilty," but the jury found him guilty as charged and found that Henderson used a deadly weapon in committing the offense charged. The trial court sentenced

Henderson to life in prison. On appeal, Henderson raises four issues challenging his conviction. For the reasons stated herein, we affirm the trial court's judgment.

State's Evidence at Trial

<u>Testimony of Officer John Fontenette</u>

John Fontenette, a sergeant with the Port Arthur Police Department, testified that he was working on the night of July 25, 2018. Fontenette recalled that he received a call from dispatch at about 10:22 p.m., after which he went to a two-story apartment complex on the west side of Port Arthur where he found a body on the ground under a white sheet. Fontenette agreed that the victim, Floyd Dergent, was shot and killed that night, and Fontenette recognized Dergent as a former classmate. Fontenette testified that he worked to secure the scene and gather evidence, and he found shell casings, a magazine from a gun, clothing thought to belong to the victim, a bicycle, and "brain matter that was on the ground[.]" Fontenette was informed by ambulance personnel at the scene that the victim was deceased. According to Fontenette, when he and his partner arrived, there were people near the body covered by the sheet, but "they were all walking away[,]" and although he tried to talk to them, no one cooperated and spoke with him. Fontenette tried a second time to talk to people north of the area where the body was located, but they were not cooperative.

Fontenette agreed that he looked at surveillance videos from the apartment complex and that he could see what happened "[f]or the most part[.]" Fontenette identified State's Exhibits 1 through 30 as photographs taken at the apartment complex the night of the incident and Exhibit 31 as video from his body-camera that night. Fontenette testified that one of the photographs was of a hat that was next to the body, and there was a hole in the side of the hat. He testified that another photograph was of a "unique bicycle[]" that they found on top of a building at the complex. Fontenette agreed that he was not involved with the case after that night.

On cross-examination, Fontenette agreed that the apartment complex was in a high-crime area where it would not be unusual to find shell casings, a magazine, or a firearm. He also testified that he was not able to identify anyone in the videos he watched at the apartment complex, nor could he identify the shooter from the video.

Testimony of Detective Eric Thomason

Eric Thomason, a detective with the Port Arthur Police Department, testified that at about 10:30 p.m. on July 25, 2018, he was dispatched to a crime scene at an apartment complex in Port Arthur, where he found Dergent's body. Thomason recalled that Dergent had received a "[b]ullet to the head[.]" Thomason agreed the complex was in a high-crime area where there were "usually a lot of people hanging out[,] . . . drug cases out there, gun cases out there, all sorts of crime." According to

3

Thomason, the officers at the scene reviewed video footage from that night that showed multiple people present, it showed the shooting "from a distance away[,]" and it showed "an altercation between the victim and the suspect[.]" Thomason testified that the officers received a lot of tips about who the shooter was but no names.

Thomason identified State's Exhibits 32 through 36 as recordings from the surveillance cameras at the apartment complex that depicted events from the night of the incident, that he had reviewed the video recordings, and that all of the videos had been reduced to a single video in Exhibit 37, which was published to the jury. According to Thomason, the person the police believed was the suspect appears in the video footage and he was a man wearing black pants and a gray muscle shirt with a "stocky, heavy build[]" and a distinctive walk. Thomason described some of the video footage at some point as showing the suspect waving his arms in the air, trying to get the attention of someone in a parking lot, and later getting into the passenger seat of a vehicle. Thomason testified that some of the video footage also shows Dergent riding a bicycle with a "funny" shaped frame. Thomason testified that later in the video the footage shows an altercation between Dergent (the victim) and the suspect, after which the suspect can be seen on the video riding Dergent's bike, and then the suspect gets off the bike and the suspect throws the bike. According to Thomason, the suspect then approached Dergent again, Dergent is shot, the suspect

4

picks something up off the ground, kicks Dergent, and then the suspect can be seen on the video walking away and exiting through the main gate. Thomason talked with Officer Carter a week or so after the shooting, to obtain her assistance in possibly identifying the suspect. Carter identified the suspect as Joshua Henderson, and Thomason testified he felt confident in Carter's identification. Thomason identified Exhibits 39 through 42 as photos printed from Henderson's Facebook page, and according to Thomason one of the photos depicts Henderson with a handgun. Thomason testified that he believed Henderson committed this crime.

On cross-examination, Thomason agreed that spent shell casings were found around Dergent's body. Thomason also agreed that the video does not show a muzzle flash that usually accompanies the discharge of a firearm, but he testified that lighting plays a big role in whether a flash can be seen and "[a] lot of modern day ammunition is actually low flash-producing ammunition." Thomason recalled that another specific name was also mentioned during the investigation as a possible suspect, but that person did not have the same physical description or build as the person seen on the video. Thomason agreed that he never found the gun in this case nor was there any DNA on any of the physical evidence collected in the case.

Testimony of Dr. Ami Murphy

Dr. Ami Murphy testified that she was a medical examiner in Pensacola, Florida at the time of trial and she was board-certified in anatomic and forensic

pathology.[1] Murphy explained that in July 2018, she was working for Forensic Medical Management Systems in Beaumont, Texas, where she performed autopsies for Jefferson County, and she performed an autopsy on Floyd Dergent. According to Murphy, there was a large amount of blood on Dergent's clothes and holes in his clothes, and some of the holes corresponded to gunshot wounds to his head and legs. Murphy recalled that Dergent had one gunshot wound to his head and one that went through both legs. In Murphy's opinion, the cause of Dergent's death was "[p]enetrating and perforating gunshot wounds of the head and legs[,]" and the manner of death was homicide.

On cross-examination, Murphy testified that toxicology tests showed that Dergent was positive for "ethanol, cocaine and its metabolite or breakdown product and, also, cotinine, which is a metabolite or breakdown product of nicotine." Murphy agreed that cocaine is associated with risk-taking and aggression. She further testified that nothing in her autopsy findings implicated anyone as the shooter.

Testimony of Officer Kandice Carter

Kandice Carter testified that, at the time of trial, she was working at a federal prison, and prior to that, she worked as a patrol officer for the Port Arthur Police Department. Carter testified that she was born and raised in Port Arthur. And, Carter was a patrol officer assigned to the area where the shooting occurred and it was an

---

[1] Dr. Murphy testified via Zoom, over no objection by the defense.

6

area she patrolled almost five days a week, so she was familiar with the area and the people. Carter recalled meeting with Detective Thomason about a week after Floyd Dergent was murdered, and Detective Thomason asked her to look at a video to try to identify someone. Carter testified that she watched the video footage, and she identified the person in the video wearing a light gray tank top and black pants as Joshua Henderson because she had known him since he was a little boy and she had seen him throughout the years. She recalled that Henderson and his twin brother played football with her little brothers in elementary or middle school. Carter did not recall having dealings with Henderson after she became a police officer, but she ran into him a few times as an adult, and she had no doubt that he was the person in the video. Carter also made a courtroom identification of the defendant as Joshua Henderson.

State's Exhibit 37, a compilation of video footage from the cameras at the apartment complex was played in court, and Carter identified Henderson in several frames or segments of the video, including footage from before, during, and after the altercation and shooting of Dergent. Carter agreed that Henderson has a "very distinct walk[]" and a noticeably broad physical stature. Carter also identified Henderson in the photo exhibits obtained from Facebook, and she agreed that the person in the Facebook photos was the same person that she identified in the video she watched. Carter testified that she would not be testifying he was the person in

7

the video if there was any doubt in her mind that "the person who shot Floyd Dergent on that video was somebody else[.]"

Testimony of Lesa Bigelow

Lesa Bigelow, a crime scene investigator with the Port Arthur Police Department, testified that she collects evidence and takes photographs at crime scenes and that she is trained in fingerprinting. Bigelow agreed she was involved in gathering and processing evidence in this case, including a bicycle at the scene. According to Bigelow, although she swabbed several locations on the bicycle, she was not able to identify any latent fingerprints on it, and no DNA was recovered. Bigelow testified that she also processed two gun magazines found at the scene, but she did not get any fingerprints from them either.

Testimony of Shauna Joseph

Shauna Joseph, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Houston, testified that she performs DNA analysis and interpretation on evidence, and she issues laboratory reports on her findings.[2] Joseph testified that her laboratory received eight sets of swabs that the Port Arthur Police Department obtained from the evidence officers gathered in their investigation of this case, and a coworker prepared them for DNA analysis, but she was not able to obtain a DNA profile from the swabs that were submitted. According to Joseph,

_____

[2] Ms. Joseph testified via Zoom, over no objection by the defense.

8

many factors affect DNA transfer from a person to an item, and there will not necessarily be DNA deposits on an item even if multiple people have touched the item.

Testimony of Jeremy Dergent

Jeremy testified that Floyd Dergent was his father. According to Jeremy, his father was a "kind guy." On cross-examination, Jeremy acknowledged that his father had a criminal history and had struggled with using drugs.

Defense Evidence at Trial

Testimony of Jasmine

Jasmine testified that on July 25, 2018, she was with her fiancé Sam, who is Joshua Henderson's twin brother, her two children, and Joshua Henderson. Jasmine identified the defendant as Joshua Henderson. According to Jasmine, Joshua was at her apartment all night and left the next morning. Jasmine testified that she remembered the night because it was the six-year anniversary of her engagement to Sam. On cross-examination, when the prosecutor asked Jasmine why she did not call the police to say it was impossible that Joshua Henderson had killed Floyd Dergent because Henderson was at her house that night, Jasmine said "I just didn't. I just didn't."

Testimony of Sam

Sam testified that on July 25, 2018, he was at home with Joshua Henderson (his fraternal twin brother), his children, and his fiancé Jasmine. According to Sam, Joshua stayed the night and left the next morning. Sam testified that his apartment was across town from the complex where Dergent was killed, and it would take about thirty minutes to drive there from his home. On cross-examination, when Sam was asked when he called the police to say it was impossible that Joshua had killed Dergent, Sam replied, "we tried to tell them, but they wouldn't believe us." Sam testified that he was present when the police went to his mother's home, but "[t]hey didn't believe us[]" and suggested the reason they did not was "[b]ecause of his priors[.]"

Testimony of George Sallier

The defense called George Sallier to testify, and on direct examination George testified that he grew up with Henderson and had known him "all [his] life." George testified that he was at the apartment complex the day Dergent was shot and although he did not recall the date, he recalled hearing gunshots the night Dergent died. George recalled that Dergent had been arguing with a man with a gray muscle shirt, and George had just walked by Dergent when he heard shots, but he did not see the shooting occur. According to George, he "took off running[]" after he heard the shots, and he looked back and the man who had been arguing with Dergent started running, too. George did not know who the man in the gray muscle tank top was,

but he knew that man was not Henderson. George also testified that he was "positive" that he did not see Henderson at the apartment complex at all that day.

On cross-examination, the prosecutor questioned George about what he saw that day. George described what he saw, he described the man in the muscle shirt, and the prosecutor asked George why he was paying so much attention to that man. The following exchange occurred:

[George]: I don't understand your question.

[Prosecutor]: Well, you said everybody was running.

[George]: Yeah.

[Prosecutor]: But you paid close attention to the man in the gray muscle shirt.

[George]: It wasn't me paying close attention to anyone. He was running out the gate by himself. Everybody was running, though. He was running out the gate by himself.

[Prosecutor]: Okay.

[George]: So on the video, that's where they showing the guy in the gray muscle shirt.

[Prosecutor]: Have you seen the video?

[George]: Yeah, I [saw] the video.

[Prosecutor]: When did you see the video?

[George ]: I [saw] the video on TV.

[Prosecutor]: What TV?

11

[George]: On the thing yesterday you - - on YouTube.

The following exchange then occurred at the bench:

[Prosecutor]: He watched it on YouTube.

[The Court]: It's all struck. We're going to strike the whole . . .
So, I guess that's what you want me to do, ask them to disregard?

[Prosecutor]: I think we have to, Judge.

The Court then stated to the jury:

So, ladies and gentlemen, you have heard me give some rules to people, and I gave certain rules prior to the case starting with regard to watching any of the proceedings on YouTube and if you were a witness or a potential witness you would not be able to testify. Based on that, obviously, that rule was not followed, so Mr. Sallier's testimony will all be struck. You are to disregard the entire testimony of Mr. Sallier.

Witness De'Adrian Mims

Before the defense called George as a witness, the defense attorney indicated at trial he had planned to call De'Adrian Mims as a witness at trial. Before De'Adrian entered the courtroom to testify, the prosecution notified the trial court that there was an outstanding felony warrant for De'Adrian's arrest. The defense counsel stated, "I did not know that" and it would be prejudicial to the defendant. Defense counsel told the trial court he did not want to call De'Adrian as a witness and stated if the State chose to arrest De'Adrian it should be done outside the courtroom. De'Adrian did not testify.

12

<u>Verdict and Sentence</u>

The jury found Henderson guilty of the murder of Floyd Dergent as charged in the indictment. After receiving further testimony on punishment, the trial court sentenced Henderson to life imprisonment. This appeal followed.

Issues

Appellant raises four issues on appeal. In his first issue he argues that he did not receive the effective assistance of counsel before and during the trial. In his second issue he argues that the trial court erred by striking the testimony of a defense witness for violating the rule of sequestration. In his third issue he argues that he did not receive the effective assistance of counsel because his trial attorney failed to call a witness with personal knowledge. And in his fourth issue he argues that he was denied due process because he did not have an opportunity to testify at the guilt-or-innocence phase of trial.

Ineffective Assistance of Counsel

In his first and third issues, Appellant alleges that he received ineffective assistance of counsel. According to Appellant, in his first trial the case resulted in a deadlocked jury, after which his first trial counsel sent him a letter that included a Motion to Withdraw as Attorney of Record. Appellant alleges that the letter stated a conflict had arisen between Henderson and his trial counsel and if trial counsel continued to represent Henderson, prejudice to Henderson would result and

13

Henderson would not receive the effective assistance of counsel. On appeal, the defense attorney attached as exhibits to the Appellant's Brief a copy of the letter and an unsigned and unfiled copy of a proposed motion to withdraw. Neither the letter nor motion to withdraw appears in our record on appeal. Appellant argues that "[i]t appears from the Court records provided to [Henderson's appellate counsel], this matter was not addressed" by the trial court. Appellant also argues that "based on this communication and Motion" that Appellant was denied his due process right to the effective assistance of counsel.

With respect to an ineffective assistance of counsel claim, our review of counsel's performance is highly deferential, and we make a strong presumption that counsel's performance fell within the wide range of reasonably professional assistance. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)). To overcome that presumption, Appellant must satisfy the two prongs established by *Strickland v. Washington* by demonstrating that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Lopez*, 343 S.W.3d at 142 (citation omitted); *see also Strickland*, 466 U.S. at 687; *Hernandez v. State*, 726 S.W.2d 53, 55-57 (Tex. Crim. App. 1986) (adopting and applying the *Strickland* test). To overcome the presumption of effectiveness and satisfy the two prongs of

*Strickland*, an appellant must rely on evidence firmly rooted in the record, unless no reasonable trial strategy could justify counsel's conduct. *See Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017) (citing *Strickland*, 466 U.S. at 688-89; *Lopez*, 343 S.W.3d at 142-43; *Andrews v. State*, 159 S.W.3d 98, 102-03 (Tex. Crim. App. 2005)); *see also Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). "Unless [an] appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 687). The record must contain evidence of counsel's reasoning, or lack thereof, to rebut that presumption. *Ortiz v. State*, 93 S.W.3d 79, 88-89 (Tex. Crim. App. 2002) ("If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal."). "When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143 (citing *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

"An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991)). Allegations of ineffectiveness must be

shown in the record, and the record must affirmatively establish the alleged ineffectiveness. *See id.* Ordinarily, on direct appeal, the record will not have been sufficiently developed during the trial regarding trial counsel's alleged errors to demonstrate in the appeal that trial counsel provided ineffective assistance under the *Strickland* standards. *See Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012).

"To show prejudice, 'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (quoting *Strickland*, 466 U.S. at 694).

As to Appellant's first issue, pertaining to the letter that his trial counsel allegedly wrote to Appellant after the first trial resulted in a deadlocked jury, neither that letter nor the proposed motion to withdraw mentioned in that letter are part of our appellate record. *See* Tex. R. App. P. 34.1 ("The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record."), 38.1(i) (requiring an appellate brief to cite to the record).[3] "An appellate court may not

---

[3] Appellant's attorney attached a copy of the trial attorney's letter to his brief on appeal. We note that even were we to consider the letter on appeal, its contents do not support the arguments made by the Appellant. The attorney's letter indicates that Henderson had expressed dissatisfaction with the attorney and had stopped communicating with the attorney. The attorney states he would file a motion to

consider factual assertions that are outside the record[.]" *Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) (citing *Janecka v. State*, 937 S.W.2d 456, 476 (Tex. Crim. App. 1996)). Therefore, Appellant has failed to show that his trial counsel's alleged deficiency was "firmly rooted in the record[.]" *See Ex parte Scott*, 541 S.W.3d at 115; *see also Bone*, 77 S.W.3d at 835. Appellant also makes only a conclusory assertion that, based on the alleged letter, there was a reasonable probability that, but for counsel's alleged deficiency, the result of the proceeding would have been different. Such a conclusory assertion is not sufficient to satisfy the *Strickland* requirements. *See Ex parte Parra*, 420 S.W.3d 821, 828 (Tex. Crim. App. 2013). We overrule Appellant's first issue.

As to Appellant's third issue, he argues that De'Adrian Mims had personal knowledge of relevant facts that were exculpatory for Henderson. We understand Appellant to argue that the defense counsel erred in failing to call the witness and the jury was not permitted to consider whether De'Adrian's testimony was relevant and credible.

---

withdraw or that he would stay on as counsel of record if Henderson wanted the attorney to continue to represent Henderson, and it gave Henderson an option of notifying the attorney if he wanted the attorney to continue to represent him at the second trial. There is nothing in our record to show that the motion to withdraw was ever filed in the record. The record also does not show whether Henderson asked the trial attorney to continue to represent him. But the record conclusively shows that the same trial attorney represented Henderson in the first and second trial.

The trial record reflects that when the defense announced that it was going to call De'Adrian as a witness, the following exchange occurred:

[Prosecutor]: I believe De'Adrian has a felony warrant out for his arrest right now out of Judge Stevens's court.

The Court: Okay. Do the bailiffs know that?

[Prosecutor]: I don't know.

[Defense counsel]: Can we just say he's not here. That may be prejudicial -- I didn't know that.

The Court: Because what?

[Defense counsel]: I don't want to call him.

The Court: That doesn't matter. If he's here - -

[Defense counsel]: I'm saying I don't want to call him anymore. They can arrest him but not in the courtroom.

The Court: Okay. Are you sure?

[Prosecutor]: Yes, ma'am.

. . .

The Court: So, Mr. [Defense counsel], did you want to call [De'Adrian] as a witness?

[Defense counsel]: No, ma'am.

The Court: All right.

[Defense counsel]: We will withdraw [De'Adrian].

18

The failure to call a witness is of no consequence unless a defendant can show that the absent witness was available, and that the defendant would have benefitted from that witness's testimony. *See Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986). Because there is a strong presumption that defense counsel's trial conduct was reasonable, strategic decisions not to call a witness will generally not be found ineffective unless a defendant overcomes the presumption. *See Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

Nothing in the appellate record reflects that Henderson would have benefitted from De'Adrian's testimony. *See Wilkerson*, 726 S.W.2d at 551. Attached to Henderson's Motion for New Trial, he included a sworn statement by De'Adrian, in which De'Adrian states that he was at the apartment complex on "July 16, 17th, or 18th of July in 2018," whereas the evidence at trial was that Dergent was killed on July 25, 2018. De'Adrian states that he did not see Henderson when he was at the complex. De'Adrian does not state that he saw Dergent or that he saw the shooting. In addition, because De'Adrian was subject to arrest, the State could have waited until De'Adrian entered the courtroom and then it could have arrested him on the outstanding felony warrant, which could have been prejudicial to Henderson. Appellant has not established that De'Adrian would have been available to testify. *See id*.

The record reflects that Henderson's trial counsel made a strategic decision not to call De'Adrian after he learned there was a warrant out for De'Adrian's arrest. In an affidavit filed after the Motion for New Trial, Henderson's trial counsel stated:

> Witnesses for the defense were called to present a consistent narrative and to counter the State's allegations. The witnesses' availability, reliability, and credibility were considered along with the Defendant's input regarding the witnesses.

Appellant has not overcome the presumption that his trial counsel's conduct was reasonable nor shown that his defense was prejudiced. *See Flores*, 387 S.W.3d at 633; *Lopez*, 343 S.W.3d at 142 (citation omitted); *Strickland*, 466 U.S. at 687; *Hernandez*, 726 S.W.2d at 55-57. We overrule Appellant's third issue.

## Exclusion of George Sallier's Testimony

Appellant's second issue argues that the trial court erred by striking George Sallier's testimony for violating the rule of sequestration ("the Rule"). According to Appellant, George's testimony was relevant and admissible, and because George was "the only eye witness" that the defense called, his testimony was crucial to Appellant's defense. Appellant argues that the trial court abused its discretion in striking all of George's testimony without a hearing to determine "how, what or the extent George might have seen something."

Under the Rule, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." *See* Tex. R. Evid.

614. At the beginning of Henderson's trial, defense counsel asked the trial court to invoke the Rule. The trial court stated to the witnesses:

> . . . You're being placed under The Rule, which means you are not going to be allowed to be in the courtroom for anyone else's testimony. Other than your lawyer, you are not allowed to discuss your testimony with anyone other than the lawyers until you're released from that rule. You are also not allowed to watch any of the proceedings on YouTube. So, if you're sitting out and anybody is watching, just kinda move yourself away from where they are. I'm also going to admonish the lawyers if you have other witnesses that are not here, you need to make sure they understand what The Rule is.
>    If anyone is listening right now on YouTube plans to be a witness or even thinks you are going to be a witness, you need to turn it off because you will not be allowed to testify if you watch any of the proceedings. . . .

The following day, George was called by the defense as a witness. During cross-examination, the prosecutor questioned George about what he had seen, and as we discussed earlier herein, George testified that he had seen the man in the gray muscle shirt in the video on YouTube on the first day of trial. After the prosecutor told the trial court "[h]e watched it on YouTube[,]" the trial court stated it would strike George's testimony and asked whether the prosecutor wanted the court to instruct the jury to disregard George's testimony. The prosecutor responded, "I think we have to, Judge[,]" the trial court stated that "Mr. Sallier's testimony will all be struck[]" for violating the Rule, and the court instructed the jury to disregard George's "entire testimony[.]"

21

The defense did not object to the trial court striking the testimony in whole or in part, nor did it request the trial court to further examine the extent of George's independent knowledge of the facts or how his testimony may have been influenced by what he saw of the trial on YouTube. The defense then rested its case.

The Court of Criminal Appeals has explained that under "the Rule," a trial court must order witnesses excluded from the courtroom during the testimony of other witnesses, upon a party's request. *See* Tex. R. Evid. 614; *Guerra v. State*, 771 S.W.2d 453, 474-75 (Tex. Crim. App. 1988) (citing Tex. Code Crim. Proc. Ann. art. 36.05 stating "in no case where the witnesses are under [the] rule shall they be allowed to hear any testimony in the case[]"); *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996) (citing a previous version of the Rule). We review a trial court's decision to strike a defense witness for a violation of the Rule under an abuse of discretion standard of review. *See Webb v. State*, 766 S.W.2d 236, 244 (Tex. Crim. App. 1989); *Green v. State*, 682 S.W.2d 271, 294 (Tex. Crim. App. 1984). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (en banc) (op. on reh'g)).

When a trial court considers disqualifying a defense witness for violation of the Rule, it must weigh both the interests of the State as well as the defendant's right

22

to defend himself. *Routier v. State*, 112 S.W.3d 554, 590 (Tex. Crim. App. 2003). In reviewing a trial court's decision to disqualify a witness, we apply the test outlined in *Webb v. State*. First, under the *Webb* test, if the Rule was violated and the witness is disqualified, we look to whether there were particular circumstances, other than the mere fact of the violation, that would tend to show the defendant or his counsel consented, procured, or otherwise had knowledge of the witness's violation, together with knowledge of the content of that witness's testimony. *Webb*, 766 S.W.2d at 244. Second, under the *Webb* test, if no particular circumstances existed to justify disqualification of the witness, we consider whether the excluded testimony was "'extraordinary' in the sense that it was crucial to his defense." *Id.*

> Where the "particular and extraordinary circumstances" show neither the defendant nor his counsel have consented, procured, connived or have knowledge of a witness or potential witness who is in violation of the sequestration rule, and the testimony of the witness is crucial to the defense, it is an abuse of discretion exercised by the trial court to disqualify the witness.

*Id.*; *see also Braswell v. Wainwright*, 463 F.2d 1148, 1156 (5th Cir. 1972) (cited by *Webb*, 766 S.W.2d at 241-42). So, a trial court should not prevent a witness from testifying solely on the basis that he violated the Rule, but a trial court does not err by excluding a witness's testimony if it finds that the excluded testimony was not crucial to the defense. *See Routier*, 112 S.W.3d at 592 (citing *Holder v. United States*, 150 U.S. 91, 92 (1893)). We apply the *Webb* standard on a case-by-case basis. *Webb*, 766 S.W.2d at 244. Although Appellant argues that the trial court failed to

23

conduct a hearing prior to striking George's testimony, the defense did not request a hearing at trial, and Appellant cites to no legal authority stating that a hearing is required nor that the trial court must weigh the *Webb* factors on the record. *See* Tex. R. App. P. 38.1(i).

Even if a trial court errs in excluding a witness under Rule 614, "the error is non-constitutional and will be disregarded unless it affected the appellant's substantial rights." *See Russell v. State*, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005) (citing Tex. R. App. P. 44.2(b)). "'A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.'" *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)); *see also Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

Appellant argues that the trial court erred by excluding George's testimony and that the testimony was "crucial" to his defense because George had "personal, eyewitness testimony." According to Appellant, before George's testimony was struck, George had testified on direct examination that he knew Henderson and had seen him frequently at the apartment complex; George was at the apartment complex when the shooting occurred; George heard shots; just prior to the shooting, George had walked by Dergent, who was arguing with a man; after the shooting, George saw that same man run away from the apartments; and George testified he did not

see Henderson at the complex when Dergent was shot. The record reflects that George testified that he did not know who shot Dergent, but he testified on direct examination that the man he saw arguing with Dergent was not Henderson. Further George testified that he could not say who actually shot Dergent because he did not see the shooting, he only heard it. George said while watching the trial on YouTube, he saw the man in the gray muscle shirt running away on the video.

To preserve a complaint for appellate review, the record must first show that the complaint was made to the trial court by a timely request, objection, or motion. *See* Tex. R. App. P. 33.1(a). Appellant did not object at trial to the trial court's decision to strike all of George's testimony, nor did he ask for a hearing or make the trial court aware of the importance of George's testimony, although the trial court had already heard George's testimony on direct and cross-examination. We conclude that this alleged error was not preserved. *See Webb*, 766 S.W.2d at 243 ("Here, appellant has preserved the issue for review by trial objection and bill of exception[.]").

But even assuming that Appellant preserved error on this issue, upon review of this record and applying the *Webb* factors, we cannot say the trial court abused its discretion in striking George's testimony because the defendant failed to establish at trial that the testimony was crucial to his defense. George testified that he heard the shooting, but he did not see the shooting, so he was not an eyewitness to the shooting,

25

as Appellant alleges. And the defense failed to provide any argument at trial regarding the need for George's testimony. The trial court could have believed that George's testimony was not crucial to Henderson's defense. *See Sherber v. State*, No. 09-10-00367-CR, 2011 Tex. App. LEXIS 7648, at **22-23 (Tex. App.—Beaumont Sept. 21, 2011, no pet.) (mem. op., not designated for publication) (citing *Routier*, 112 S.W.3d at 591). We conclude that Appellant has not met his burden to show that George's testimony was crucial to Appellant's defense, and the trial court's decision to strike George's testimony was within the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 343-44; *Routier*, 112 S.W.3d at 591; *Webb*, 766 S.W.2d at 244.

That said, even if the trial court had erred in striking George's testimony, Appellant also has not shown that his substantial rights were harmed by the trial court's ruling. *See* Tex. R. App. P. 44.2(b); *Russell*, 155 S.W.3d at 181. Photographs of the scene were admitted into evidence as well as a video of events at the apartment complex on the day of the shooting. Detective Thomason testified that the police believed the suspect was a stocky man wearing a gray muscle shirt with a distinctive walk. Thomason also testified that the video depicted an altercation, after which the suspect rode Dergent's bike. According to Thomason, although another person was mentioned as a suspect at one point, that person did not have the same physical description as the person seen in the video. Officer Kandice Carter testified that she

had known Henderson since they were both children, that Henderson had a broad build and a distinctive walk, and she had no doubt that Henderson was the individual depicted in the video. The jury as factfinder viewed the video and photographs, and it could have believed the State's witnesses and disbelieved the defense witnesses.[4] *See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). We are unable to say with fair assurance that any error in striking George's testimony influenced the jury or that the exclusion of George's testimony affected Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Russell*, 155 S.W.3d at 181. We overrule Appellant's second issue.

## Defendant's Right to Testify

In Appellant's fourth issue, he argues that he was not given the opportunity to testify on his own behalf and that neither his trial counsel nor the trial court asked whether he wanted to testify. Appellant does not allege that his trial counsel did not inform him of his right to testify. Instead, he complains that neither his trial counsel nor the trial court asked whether he wished to testify on his own behalf. Although Appellant does not explicitly argue that he was denied the effective assistance of counsel because he was not given the opportunity to testify, he raises *Strickland* issues in his argument.

---

[4] Appellant does not challenge the sufficiency of the evidence on appeal, nor did he do so in his motion for new trial.

A defendant has a right to testify at his own trial. *Johnson v. State*, 169 S.W.3d 223, 232, 235 (Tex. Crim. App. 2005) (citing *Rock v. Arkansas*, 483 U.S. 44, 52 (1987)). In *Johnson*, the Court of Criminal Appeals held that a trial court has no duty to inform a defendant represented by counsel of his right to testify, and it is the responsibility of defense counsel to inform a defendant of his right to testify, including the fact that the ultimate decision of whether to testify belongs to the defendant. *Id.* at 235.

During voir dire, the trial court told the venire that "a defendant can elect not to testify. And if they elect not to testify, you cannot use that against them." The prosecutor told the venire, "[i]f Mr. Henderson chooses not to testify, the law says you cannot hold that against him as a sign of his guilt." Defense counsel also told the jury that, under the Fifth Amendment, the defendant does not have to testify at trial. The jury charge instructed the jury that the defendant has a constitutional right to remain silent, he may choose to testify or not testify, his decision not to testify cannot be held against him, and the jury may not speculate about what the defendant might have said if he testified or why he did not testify.

Appellant contends that "his trial counsel would not allow him to testify on his own behalf at the guilt phase of trial." Appellant provides no citation to the appellate record in support of his assertion, and his argument is not supported by anything in the record. *See* Tex. R. App. P. 38.1(i). Appellant's brief fails to include

any further discussion about trial counsel's advice to Henderson about testifying. Considering the lack of a record on this complaint, and the lack of any explanation in the record concerning trial counsel's motivation or strategy, even when we assume his trial attorney advised Henderson not to testify, Henderson has not overcome the strong presumption that counsel's performance was adequate. *See West v. State*, 474 S.W.3d 785, 794 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We conclude that Appellant's issue is not supported by the record, and it has been inadequately briefed. *See Gonzalez v. State*, 616 S.W.3d 585, 587 (Tex. Crim. App. 2020) (citing Tex. R. App. P. 38.1(i); *Wolfe v. State*, 509 S.W.3d 325, 342-43 (Tex. Crim. App. 2017); *Lucio v. State*, 353 S.W.3d 873, 877-78 (Tex. Crim. App. 2011); *Murphy v. State*, 112 S.W.3d 592, 596 (Tex. Crim. App. 2003)); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) (explaining that an appellate court has no obligation to construct and compose an appellant's issues, facts, and arguments or to find support in the record and legal authority). To the extent Appellant intended to argue that he did not receive the effective assistance of counsel because his trial counsel did not allow him to testify, by failing to cite to the record, he has not met his burden. "Ineffective assistance of counsel claims are not built on retrospective speculation; they must 'be firmly founded in the record.'" *See Bone*, 77 S.W.3d at 835 (quoting *Thompson*, 9 S.W.3d at 813). We overrule Appellant's fourth issue.

Having overruled Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 21, 2023
Opinion Delivered March 22, 2023
Do Not Publish

Before Horton, Johnson and Wright, JJ.